Kalman ROSS and Anita Ross, Appellants,

v.

A. H. ROBINS COMPANY, INC., E. Claiborne Robins, William I. Zimmer, III, E. Claiborne Robins, Jr., George E. Thomas, Kenneth L. Roberts, Charles E. Saltzman and Stuart Shumate, Appellees.

No. 1017, Docket 79-7106.

United States Court of Appeals, Second Circuit.

Argued May 25, 1979.

Decided Sept. 24, 1979.

Wolf, Popper, Ross, Wolf & Jones, New York City (Eric L. Keisman, Marian R. Probst, New York City, of counsel), for plaintiffs-appellants.

Cahill, Gordon & Reindel, New York City (William E. Hegarty, Joseph W. Muccia, Charles A. Gilman, John C. Koutsos, New York City, of counsel), and McGuire, Woods & Battle, Richmond, Va. (Rober H. Patterson, Jr., R. Gordon Smith, Anne Marie Whittemore, Richmond, Va., of counsel), for defendants-appellees.

Paul Gonson, Principal Associate Gen. Counsel, Michael K. Wolensky, Asst. Gen. Counsel, and Philip H. Becker, Washington, D.C., for amicus curiae, Securities and Exchange Commission.

Before MANSFIELD and GURFEIN, Circuit Judges, and MISHLER,* District Judge.

MISHLER, District Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York, Pierce, J., dismissing plaintiffs' proposed class action. Plaintiffs, Kalman and Anita Ross, allege that on July 23, 1973 they purchased 100 shares of common stock of the defendant company, A. H. Robins Company, Inc., ("Robins"), a manufacturer and distributor of pharmaceutical products. They instituted this action pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5 and common law principles, on behalf of all persons who purchased such stock "from April 1972 through in or about July, 1974 . . . and who still owned shares of Robins at the end of

said period and who have suffered damages as a result thereof." (Complaint ¶ 2). In addition to Robins, also named as defendants are seven individuals who are identified as directors and/or officers of Robins. The gravamen of the complaint is that the defendants manipulated and artificially inflated the market price of Robins' common stock by disseminating false and misleading information about the effectiveness and safety of the Dalkon Shield, an interuterine birth control device which it manufactured, and by failing to reveal information which indicated that the shield was less effective and more dangerous than the company's earlier public statements had indicated. The district court determined that: (1) to the extent that the alleged false and misleading statements were contained in papers filed with the Securities and Exchange Commission, the plaintiffs could not maintain the action under § 10(b) and Rule 10b–5. Their exclusive remedy was under § 18 of the Exchange Act, 15 U.S.C. § 78r; and (2) the plaintiffs had failed to plead with the degree of specificity required in fraud actions by Rule 9(b) Fed.R.Civ.P. Therefore, the court dismissed the action with prejudice.

We hold that the district court erred in concluding that the action could not be maintained under § 10(b) of the Exchange Act and Rule 10b–5. On the question of the pleadings, we agree with the determination made below that the complaint fails to meet the requirements of Rule 9(b). However, because we are hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings, we believe that the plaintiffs should be afforded an additional, albeit final opportunity to conform the pleadings to Rule 9(b).

*The Complaint*

The complaint which is the subject of this appeal was filed in the district court on June 1, 1978.[1] It contains the following

---

* Honorable Jacob Mishler, United States District Judge, Eastern District of New York, sitting by designation.

1. The original complaint in this action was filed on March 23, 1977. In an opinion and order dated April 6, 1978, Judge Pierce dismissed the

pertinent allegations: Robins is a Virginia corporation primarily engaged in the "development, manufacture and distribution of ethical pharmaceutical products and brand name consumer products." (Complaint ¶ 4). The individual defendants were "at all times material hereto" directors of the defendant corporation. Some of the defendants were also officers of Robins. (Complaint ¶ 5–¶ 9).[2] "At all relevant times, the Board of Directors of Robins had the responsibility for the dissemination of information to the public, including the statements alleged in the reports referred to in the complaint as well as the information not disclosed to the public as further alleged in the complaint." (Complaint ¶ 10).

The gist of plaintiffs' claim is contained in paragraph 13:

Since sometime in or about April 1972 and continuing in or about July, 1974, Robins and the individual defendants herein have engaged in a scheme and plan and continuous course of conduct to deceive the investing public, including plaintiffs, as to the true financial condition and prospects of Robins, particularly with respect to matters concerning the Dalkon Shield, and to conceal from the investing public, including plaintiffs, facts, among other things, concerning the safety and efficiency of the Dalkon Shield and the effect of such upon Robins operating and financial condition.

According to paragraph 14:

Prior to the commencement of the class period, Robins with approval of its Board of Directors which consisted of defendant Robins, Robins, Jr., Roberts, Saltzman and Shumate,[3] prepared, issued and disseminated statements to the investing public highlighting developments with regard to the Dalkon Shield and publicizing its significant impact upon the business affairs of Robins. Said statements also stressed the safety, reliability and efficiency of the Dalkon Shield, particularly with regard to Robins' testing procedures and practices.

These statements are quoted at length and identified as appearing in Robins' 1970 Annual Report, 1971 Annual Report and a prospectus issued in or about March 1972. (Complaint ¶ 15—¶ 17).[4]

Paragraph 18 is of crucial importance.[5] It charges that

---

complaint for failure to meet the pleading requirements of Rule 9(b) Fed.R.Civ.P. Leave to replead was granted. Thereafter, on May 19, 1978, an amended complaint was filed. A corrected amended complaint was filed June 1, 1978.

2. Specifically, the complaint alleges:

¶ 5. Defendant E. Clairborne Robins is, and at all times material hereto, has been Chairman of the Board of Directors of Robins.

¶ 6. Defendant William I. Zimmer, III, is a director of Robins and was at all times material hereto, the President and Chief Executive Officer of Robins.

¶ 7. Defendant E. Clairborne Robins, Jr., is the President, Chief Executive officer and a director of Robins and was at all times material hereto, the Vice President and a director of Robins.

¶ 8. Defendant George E. Thomas is, and at all times material hereto, has been the Executive Vice President and a director of Robins.

¶ 9. Defendants E. Clairborne Robins, E. Clairborne Robins, Jr., Stuart Shumate and William L. Zimmer, III, and George E. Thomas are, and defendants Kenneth C. Roberts and Charles E. Saltzman were at all relevant times hereto, directors of Robins.

3. Defendants George Thomas and William Zimmer are not alleged to have been directors during this period.

4. For example, paragraph 15 indicates that Robins' 1970 Annual Report stated, in part, that:

Clinical tests indicate that the Dalkon Shield offers a low [sic] incidence of spontaneous expulsion, cramping and bleeding than other IUD's, as well as greater protection against pregnancy. We feel it has great promise, in the international as well as the domestic market, and have set up a special staff to introduce it widely in a number of areas overseas.

5. It reads in its entirety:

During the class period, Robins and the individual defendants knew or recklessly disregarded the fact that there were serious questions as to the safety and efficiency of the Dalkon Shield as evidenced by, among other things, the following facts all of which the said defendants knew or recklessly disregarded: (a) the actual pregnancy rate from the use of the Dalkon Shield was significantly higher than the low pregnancy rate Robins had indicated in the 1970 Annual Report as

[d]uring the class period, Robins and the individual defendants knew or recklessly disregarded the fact that there were serious questions as to the safety and efficiency of the Dalkon Shield . . . ..

Specifically, it alleges that "among other things" the "defendants knew or recklessly disregarded," *inter alia,* the "facts" that the pregnancy rate from use of the shield "was significantly higher than the low pregnancy rate Robins had indicated in [its] 1970 Annual Report . . .," and that, "the rate of medical removals of the shield required by manifestations of pain, bleeding and infection was significantly higher than . . . indicated in the 1970 Annual Report . . .." These facts were evidenced by data "found in an updated April 1972 unpublished study on the Shield by Mary Gabrielson . . . ." Paragraph 18 further states the defendants knew or recklessly disregarded the fact that: their conclusions about the shield's safety and effectiveness were based on insufficient data; that in 1972 and 1973 there was an "alarming increase" in the rate of septic abortions and deaths resulting from the shield; and that other "significant health hazards" existed.

Paragraph 20 states that the defendants "failed to make proper and timely disclosure" of these facts and the fact that "Rob-

ins was incurring substantial risks to its reputation . . . and substantial risks of substantial liability for injuries from use of the Dalkon Shield."

The complaint also charges that "during the class period" further misleading statements "were made and issued with the knowledge, approval and/or acquiescence of Robins' Board of Directors which consisted at all relevant times of the individual defendants." (Complaint ¶ 21). These statements, language of which is quoted, were allegedly contained in: Robins' 10–K forms for the fiscal years ending December 1972 and December 1973; a press release issued April 19, 1973; press releases dated July 18, 1973, January 31, 1974 and April 18, 1974; and Robins' 1973 Annual Report issued in March 1974. (Complaint ¶ 22–¶ 33). In plaintiffs' view, these statements were misleading in that they continued to speak glowingly of the company and of continued expectations of success and did not disclose the serious problems concerning Robins' continued sale and distribution of the Dalkon Shield.

The named plaintiffs and members of the putative class allegedly "made their purchases of Robins' common stock at prices that were inflated by [these] misleading public reports and press releases and the representations contained therein and by

evidenced, among other things, by the fact that the rate of pregnancy from use of the Dalkon Shield had been found in an updated April 1972 unpublished study on the Shield by Mary Gabrielson to be 5.1% rather than 1.8% as reported in a published study by Ms. Gabrielson approximately a year earlier; (b) that the rate of medical removals of the shield required by manifestations of pain, bleeding and infection was significantly higher than the low medical removal rate Robins had indicated in the 1970 Annual Report as evidenced, among other things, by the fact that the rate of medical removals for the shield required by manifestations of pain, bleeding and infection had been found in the aforementioned April 1972 unpublished study to be 26.4% rather than 14.9% as reported in the aforementioned earlier published study by Ms. Gabrielson; (c) that there were no studies conducted on the Dalkon Shield which involved more than 5.5 months of patient use, and thus there was insufficient clinical data to enable said defendants to reach

scientifically valid conclusions concerning the pregnancy and/or medical removal rates for the shield; (f) that the Dalkon Shield was capable of and had caused septic abortions (badly infected miscarriages) in women who became pregnant with the Dalkon Shield in place, (g) that since 1972 there was a rapid and alarming increase in the rate of septic abortions from use of the shield, (h) that there had been at least 20 septic abortions by the end of 1972 and 200 by the end of 1973, (h) that the Dalkon Shield was capable of and had caused death from such septic abortions, (i) that since 1972 there was a rapid and alarming increase in the rate of deaths from septic abortions from use of the shield, (k) that at least 7 women had died from septic abortions in 1972 and 13 by the end of 1973, and (j) that there were other significant health hazards from use of the Dalkon Shield including a substantial number of reported cases of perforation of the uterus, pelvic inflammatory disease and ectopic pregnancy. (Subparagraphs lettered as in original).

defendants' failure to disclose . . . adverse matter . . . ." (Complaint ¶ 46).

Sometime beginning in or about the middle of May 1974, information about the serious medical problems which were resulting from use of the Dalkon Shield began to be disclosed to the public.[6] As a consequence of this, of resulting investigations by the Food and Drug Administration, and the Department of Health, Education and Welfare, and the institution of over 500 product liability suits, "Robins' reputation and position in its industry have been jeopardized and its business prospects adversely affected." (Complaint ¶ 43). The value of its common stock "dropped from approximately $19 to $13 per share on the New York Stock Exchange." (Complaint ¶ 45).

The defendants' conduct is alleged to have violated § 10(b) and Rule 10b–5.[7] Specifically, it is stated that the "defendants had a duty to disclose [adverse] information [about the Dalkon Shield] in order to correct the false and misleading impression created by [their earlier] statements . . . ." (Complaint ¶ 20). These statements had indicated that the shield was safe and reliable and would continue to contribute to Robins' sales and earnings.

*The District Court Opinion*

The defendants moved the district court for an order dismissing the complaint on the grounds that: (1) the court lacked subject matter jurisdiction over the action; (2) the action could not be maintained under § 10(b) and Rule 10b–5 because § 18 of the Exchange Act was the exclusive remedy for the acts complained of; and (3) it failed to comply with the pleading requirements of Rule 9(b) Fed.R.Civ.P.

Judge Pierce rejected the defendants' contention that the complaint essentially stated claims for corporate mismanagement and was therefore not properly brought under the federal securities laws. He concluded that plaintiffs' claim "is arguably within the purview of Section 10(b) unless Section 18 of the Securities Exchange Act of 1934 provides plaintiffs an exclusive remedy." The district court analyzed the substantial differences between sections 10 and 18 of the Exchange Act. *See* discussion *infra.* Reviewing the "legislative scheme embodied in the 1934 Act," the court concluded that "[t]he substantive and procedural requirements contained therein implicitly indicate that Congress intended [§ 18] to be the primary vehicle for remedying the unlawful acts it proscribes." It held that as to material misstatements and omissions contained in papers filed with the S.E.C., the plaintiffs could proceed only under § 18 of the Exchange Act.

The district court also determined that the complaint did not meet the pleading requirement of Rule 9(b) in that it failed to aver the alleged fraud with particularity. Two primary shortcomings in the complaint were noted. First, the complaint failed to "particularize the time when the defendants allegedly knew or recklessly disregarded the undisclosed information." This failing was found to be particularly crucial because the defendants' purported duty to disclose adverse information concerning the shield might have arisen during the class period but after the named plaintiffs' purchase. In that case, they would not be proper class representatives. Secondly, the complaint was held defective because it did not set forth "the circumstances which lead [plaintiffs] to believe that defendants knew or recklessly disregarded the information

---

**6.** It is alleged that during the middle of May, Robins sent a letter to approximately 120,000 physicians nationwide warning that severe complications, including death, had resulted from use of the Shield. (Complaint ¶ 34).

**7.** Plaintiffs charge, in language almost identical to that of Rule 10b–5, that the defendants: (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Robins stock. (¶ 48).

contained in the 1972 study prior to their own purchase of Robins common stock." Because the plaintiffs had already been given the opportunity to cure defects in the complaint by repleading, *see* footnote 1, *supra*, the complaint was dismissed without leave to replead. A timely appeal was taken to this court. The S.E.C. appeared as amicus curiae urging reversal of the district court's determination that the action could not be brought under § 10(b) and Rule 10b–5.

## I.

The Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("1933 Act") and the 1934 Act "constitute interrelated components of the federal regulatory scheme governing transactions in securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed. 668 (1967). While only a limited number of the Acts' provisions contain authorizations for private civil actions,[8] courts have found implied causes of action in many of the Acts' other sections.[9] It is inevitable that such a complex scheme of regulation, which has developed in judicial decisions spanning almost half a century, will spawn numerous difficult problems regarding the interplay of the Acts' express and implied remedies. In this case, we are called upon to answer a question specifically left open by the Supreme Court, *viz.*, "whether a cause of action may be maintained under § 10(b) on the basis of actions that would constitute a violation of § 18 [of the 1934 Act]." *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 211 n.31, 96 S.Ct. at 1389 n.31.[10] We have found no Court of Appeals decision which directly addresses this issue.[11] The district courts which have faced the question have adopted divergent views.[12]

Section 18 expressly creates a private remedy for "false or misleading" statements contained in "any application, report or document" filed with the S.E.C. pursuant to the 1934 Act in favor of any person "who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement."[13]

---

**8.** *See* §§ 11, 12, and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77l, 77o; §§ 9, 16, 18, 20 of the 1934 Act, 15 U.S.C. §§ 78i, 78p, 78r, 78t.

**9.** *See* § 17 of the 1933 Act, 15 U.S.C. § 77q; §§ 6, 9, 10, 14, 15 of the 1934 Act, 15 U.S.C. §§ 78f, 78i, 78j, 78n, 78o.

**10.** In a subsequent decision not involving § 10(b), *Touche Ross & Co. v. Redington*, —— U.S. ——, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court, while indicating that "[t]here is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the Commission," *id.* at ——, 99 S.Ct. at 2488, on the facts before it, expressly found no need to decide the issue. *Id.*

**11.** Implicit in this court's decision in *Heit v. Weitzen*, 402 F.2d 909 (2d Cir. 1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), is the view that actions may be maintained under either provision. However, because the question before us does not appear to have been explicitly raised, we do not view the case as squarely deciding the issue.

**12.** *Compare Pearlstein v. Justice Mortgage Investors*, [Current] CCH Fed.Sec.L.Rep. ¶ 96,760 at 84,474–75 (N.D.Tex.1978); *Berman v. Richford Industries, Inc.*, [1978] CCH Fed.Sec.L. Rep. ¶ 96,518 at 94,013 (S.D.N.Y.1978); *Kul-*

*chok v. Government Employees Insurance Co.*, [1977–1978] CCH Fed.Sec.L.Rep. ¶ 96,002 at 91,512 (D.D.C.1977) (holding that § 18 is the exclusive remedy in respect of materially misleading statements filed with the S.E.C.), *with Wachovia Bank & Trust Co. v. National Student Marketing Corp.*, 461 F.Supp. 999 (D.D.C. 1978); *Seiden v. Nicholson*, 69 F.R.D. 681 (N.D. Ill.1976) (reaching opposite conclusion).

**13.** Section 18 provides, in its entirety:

Liability for misleading statements

(a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at

*See Touche Ross & Co. v. Redington,* —— U.S. ——, ——, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979). While this remedy has rarely been invoked, the remedy available under § 10(b) and Rule 10b–5 has become "a judicial oak . . . grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975). By its terms, § 10(b) prohibits a broader range of conduct than does § 18. It makes it "unlawful for any person . . . [t]o use . . . in connection with the purchase or sale, of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ."[14] Neither § 10(b) nor Rule 10b–5 promulgated by the S.E.C.[15] explicitly creates any private rights of action. However, notwithstanding the absence of any such provision, it was held in *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D. Pa.1946), that a private action could be maintained to redress a violation of § 10(b) and Rule 10b–5. Some 25 years later, the Supreme Court, in its own words "confirmed with virtually no discussion the overwhelming consensus of the District Courts and Courts of Appeals that such a cause of action did exist." *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 730, 95 S.Ct. at 1923 (citing *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 150–154, 92 S.Ct. 1456, 1470–1472, 31 L.Ed.2d 741 (1972)).

Whether a plaintiff can rely upon an implied right of action under § 10(b) and Rule 10b–5 or must proceed according to the terms of § 18 can be an issue of controlling significance. Section 18 requires that a plaintiff establish knowledge of and reliance upon the alleged misstatements contained in any document filed with the S.E.C. *Heit v. Weitzen,* 402 F.2d 909, 916 (2d Cir. 1968), *cert. denied,* 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969) ("Reliance on the actual [filed] report is an essential prerequisite for a Section 18 action and constructive reliance is not sufficient."); *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 525 (S.D.N.Y.1977) ("Plaintiff may only recover if he is able to establish reliance on the actual 10–K form," or

law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant. (b) Every person who becomes liable to make payment under this section may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment. (c) No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

14. The full text of § 10(b) provides:
Manipulative and Deceptive Devices
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15. Rule 10b–5 states:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

upon "relevant parts of the 10–K forms reported in some other source . . . ."). In a § 10(b) action, however, reliance is presumed once the materiality of an omission is established, *Affiliated Ute Citizens v. United States, supra,*[16] or the material misrepresentation affected the price of stock traded on the open market. *Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir. 1975); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 374 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). In this case, plaintiffs allege that defendants' misleading statements in reports filed with the S.E.C. artificially affected the market price of Robins' stock. They do not allege, however, that they directly relied on those statements when they purchased the stock. Thus, while their allegations arguable state a claim under § 10(b) and Rule 10b–5, they omit one of the essential elements of a § 18 claim. Accordingly, even if plaintiffs were able to prove the defendants' wrongdoing, under the district court's view that § 18 provides the exclusive basis of liability for misstatements contained in filed reports, they would be left without a remedy. We are called upon today to determine whether such a result represents the proper accommodation between sections 10(b) and 18 of the 1934 Act and between the judicial and legislative functions.

We begin our analysis by noting that much of the case law relied upon by the parties is inapposite. Defendants argue that disposition of the case before us is controlled by *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). There, the Supreme Court refused to imply a cause of action under a provision of the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 *et seq.,* because it found that the express remedies provided in the Act were "the exclusive

means to enforce the duties and obligations imposed by the Act." *Id.* at 458, 94 S.Ct. at 693. Relying on this holding, defendants urge that since § 18 provides an express remedy for the acts complained of, we should not imply a remedy for those acts under § 10(b). Plaintiffs on the other hand contend that the factors enunciated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), relevant in determining "whether a private remedy is implicit in a statute not expressly providing one" are pertinent to our determination. In their view, application of these factors requires a finding that a remedy should be fashioned under § 10(b) for the activities alleged in the complaint.

In our view, neither of these cases is particularly instructive. Both deal primarily with the issue of under what circumstances a private civil remedy should be judicially created for the violation of a particular statutory provision. Other recent Supreme Court decisions have also addressed this issue. *See, e. g., Touche Ross & Co. v. Redington, supra; Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

We, however, are not being asked to create a new judicial remedy. It is well established that a private remedy exists for actions violative of § 10(b) and Rule 10b–5. Rather than being asked to *create* a new remedy, we are being asked to determine whether a party should be allowed to invoke an established remedy in the face of a statute which may, in certain circumstances, provide another remedy for the same conduct. Resolution of this issue turns upon the question of whether allowing invocation of the § 10(b) remedy would impermissibly nullify the limitations and requirements inherent in § 18. We conclude that it would not.

Plaintiffs' position is that where a party can state a claim under § 10(b), it is of no

---

**16.** There are other significant differences between these statutory provisions. Actions under section 18 are limited by a short statute of limitations (§ 18(c)); the district court may require the plaintiff to post a bond for costs, including attorneys' fees, and may assess such costs at the conclusion of the litigation. (§ 18(a)). *See* note 12 *supra.* However, such security provisions are not applicable in actions under section 10(b). Because no statute of limitations is provided for in § 10(b) actions, courts are required to look to state law.

significance that the party cannot proceed under the terms of an express remedy designed to reach the conduct complained of:

> There is simply no historical support for the proposition that Congress, in enacting the general antifraud provision of the Exchange Act, intended it to be constricted wherever a pattern of conduct falling within its prohibitions also included some single element . . . of a pattern of conduct prohibited by another section of the Act . . . .[17]

This view is supported by the language of the Court in *S.E.C. v. National Securities*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969):

> [T]he existence or nonexistence of regulation under § 14 [does] not affect the scope of § 10(b) and Rule 10b–5. The two sections of the Act apply to different sets of situations. Section 10(b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale. *The fact that there may well be some overlap is neither unusual nor unfortunate.*

*Id.* at 468, 89 S.Ct. at 573 (emphasis added). *See also Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287, 1293 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976) ("The plaintiffs may make their claim for relief under Rule 10b–5 even though the alleged market rigging scheme also falls squarely within section 9(a)(2)" of the 1934 Act.).

Notwithstanding these cited authorities, we believe that this position is overly broad in light of more recent Supreme Court decisions which have cast considerable doubt on the continuing vitality of the view that the remedies in the securities acts were meant to freely overlap.

In *Ernst & Ernst v. Hochfelder, supra*, the Court held that the significant procedural restrictions attendant to actions under the express remedies of the 1933 Act which allow recovery based on negligent conduct

> indicate that the judicially created private damages remedy under § 10(b)— which has no comparable restrictions— cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing. Such extension would allow causes of action covered by §§ 11, 12(2) and 15 to be brought instead under § 10(b) and thereby nullify the effectiveness of the carefully drawn procedural restrictions on these express actions.

425 U.S. at 210, 96 S.Ct. at 1389. *See also Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 736, 95 S.Ct. at 1925–1926 (In establishing the purchaser-seller requirement in § 10(b) actions, the Court indicated that "[i]t would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.").

Similarly, in *Touche Ross & Co. v. Redington, supra*, —— U.S. at ——, 99 S.Ct. at 2488, the Court, in finding it improper to imply a cause of action under § 17 of the 1934 Act, stated:

> [W]here the principal express civil remedy for misstatements in reports [§ 18] . . . is by its terms limited to purchasers and sellers of securities, we are extremely reluctant to imply a cause of action in § 17(a) that is significantly broader than the remedy that Congress chose to provide.

These decisions lend at least some support to defendants' position that § 10(b) should be viewed as a "catch-all" provision intended to prevent the use of manipulative and deceptive devices not proscribed by other provisions of the Act and not as a "vehicle

---

17. Brief for Plaintiffs-Appellants at 64. Plaintiffs add that "[i]f it had been meant [by Congress] merely to cover situations which contained no factual element of any conduct specifically prohibited, it would have been perfectly simple for Congress to have prohibited . . . only those deceptive or manipulative devices 'not otherwise prohibited.' " Brief at 61.

for bypassing the carefully drawn express remedies created by Congress." [18]

We do not believe, however, that by permitting the plaintiffs to proceed under § 10(b) in the instant case, we would be nullifying the terms of the remedy which Congress designed in § 18. Our conclusion rests in large part upon this court's decision in *Fischman v. Raytheon Manufacturing Co.*, 188 F.2d 783 (2d Cir. 1951). In *Fischman*, both preferred and common stockholders of the defendant company, alleging that the company had made material misrepresentations in a prospectus and registration statement, instituted an action pursuant to § 10(b) and Rule 10b–5 and § 11 of the 1933 Act. Section 11 creates a cause of action in favor of any person acquiring stock where the relevant registration statement contains a material factual misrepresentation.[19] "The common stockholders [had] no claim under § 11 of the 1933 Act, since they purchased no securities which were the subject of the prospectus and registration statement." *Id.* at 786. Nevertheless, this court held that the common stockholders could proceed under § 10(b) and Rule 10b–5 notwithstanding the fact that § 10(b) was not subject to the short statute of limitations or bonding requirement of § 11. Indeed, the court suggested that the plaintiffs could proceed not only under § 10(b) of the 1934 Act, but also under sections 9(a)(4) and 18 of that Act. Portions of the court's opinion may be read as adopting the position that the securities laws provide overlapping remedies. More significant, however, is the *Fischman* court's articulated rationale for its holding. The court stated that

> when, to conduct actionable under § 11 of the 1933 Act, *there is added the ingredient of fraud*, then that conduct becomes actionable under § 10(b) of the 1934 Act . . . whether or not [the plaintiff]

could maintain a suit under § 11 of the 1933 Act.

188 F.2d at 787 (emphasis added).

Defendants here correctly point out that § 11 of the 1933 Act proscribes conduct which is different from that within the purview of § 10(b). Whereas the latter provision, as the Supreme Court's holding in *Ernst & Ernst v. Hochfelder, supra*, makes clear, predicates relief upon a showing of fraud or deceit, the former provision does not. It was on this basis that the *Fischman* court, anticipating the holding in *Ernst & Ernst*, sanctioned plaintiffs' action under § 10(b). *See Beecher v. Able,* 435 F.Supp. 397, 412 (S.D.N.Y.1977) ("Although plaintiffs need not under § 10(b) meet various stringent requirements under § 11, they must sustain a significantly greater burden of proof."). Defendants contend that in the instant case, on the other hand, no similar justification exists for bypassing the express "reliance" requirement of § 18. We disagree.

Under the rule established in *Ernst & Ernst v. Hochfelder, supra*, a party may not be held liable under § 10(b) unless he acted with scienter. It may well be that a similar requirement attaches to § 18 liability. *See Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 211 n.31, 96 S.Ct. at 1389 n.31 ("[T]he legislative history of . . . section [18] suggests something more than negligence on the part of the defendant is required for recovery."). But, we may leave for another day the issue whether something akin to scienter is the sine qua non of a defendant's liability under § 18. In any case, there are substantial differences in the burden facing the plaintiff under the two statutes—differences which justify application of the logic of *Fischman*.

 To establish a § 10(b) violation, *the plaintiff must plead and prove* that the defendant acted with scienter in making a

---

18. Brief for Defendants-Appellees at 40.

19. Section 11 of the 1933 Act, 15 U.S.C. § 77k, creates a cause of action at law or in equity in favor of any person acquiring a security where the relevant registration statement contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . (unless it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission). . . . ."

material misstatement or omission. A plaintiff seeking recovery under § 18 faces a significantly lighter burden. He must merely plead and prove that a document filed with the Commission contains a material misstatement or omission. If he can show reliance on that statement, liability is established, unless by the very terms of section 18, *the person sued shall prove that he acted in "good faith and had no knowledge that such statement was false or misleading."* (emphasis added). *See Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 211 n.31, 96 S.Ct. at 1389 n.31. As is readily apparent this difference may prove critical. A plaintiff unable to allege those specific facts necessary under Fed.R.Civ.P. 9(b) which would raise a strong inference of scienter, *see* discussion *infra*, would not be able to establish a *prima facie* case under § 10(b). The very same plaintiff, however, could proceed under § 18. Moreover, the ultimate outcome of the litigation may hinge upon who bears the burden of establishing the defendant's state of mind. In our view the far more difficult task which confronts a plaintiff seeking to proceed under § 10(b) provides a rationale for dispensing with the reliance requirement inherent in § 18. Moreover, for several other reasons we are unwilling to bar plaintiffs from proceeding under § 10(b) and Rule 10b–5.

To now hold, at this late date, that conduct is not proscribed by § 10(b) merely because it is also subject to § 18 would effectively deprive open market investors who relied on misleading market information of any remedy simply because the misinformation happened to be lodged in a form filed with the S.E.C. Such a result would be remarkably incongruous in view of the fact that it is the open market investor who over the years has become one of the prime beneficiaries of the protections afforded by § 10(b) and Rule 10b–5. As we have already indicated, we are not being asked to liberalize even further the recognized implied right of action under § 10(b) or judicially to create a new right in place of that provided by § 18. *Cf. Touche Ross & Co. v. Redington, supra.* Rather, plaintiffs only ask that we permit § 10(b) to be used, as it has in the past, to state a claim that is beyond the scope of § 18—the latter section furthering the narrow and particularized objective of encouraging use of and reliance upon records filed with the S.E.C., by expressly authorizing damage suits against those who make them depositaries of materially false or misleading statements. Furthermore, we can conceive of no rational purpose which would be furthered by creating a structure where liability for material misrepresentations adversely affecting investors would vary tremendously depending upon whether the statement happened to be filed with the S.E.C. Accepting the existence of a private action under § 10(b) and its well established contours, *see Cannon v. University of Chicago, supra,* 441 U.S. at 691 n.13, 99 S.Ct. at 1955 n.13 (recognizing that the very existence of the implied right of action under § 10(b) can be explained historically), we believe that we can fairly say that Congress would not approve of such a disparity. We also believe that holding that plaintiffs must proceed under the terms of § 18 because the statements were filed with the S.E.C. would encourage corporate managers to include their misrepresentations in material filed with the S.E.C., for the sole purpose of insulating themselves from liability under § 10(b) and restricting the class of potential plaintiffs to the unlikely few who actually viewed and relied on the misleading information.

In view of the alternatives that face us, we choose the one which we believe gives controlling weight to the fundamental policies underlying the securities acts and which recognizes that § 10(b) and Rule 10b–5 have become, by careful judicial construction, the primary mechanisms by which open market investors can seek redress against those who manipulate the market by fraudulent activity.

We conclude that even as to those documents filed with the S.E.C., plaintiffs may seek to prosecute their claim under § 10(b) and Rule 10b–5.

## II.

Rule 9(b) Fed.R.Civ.P. provides:

Fraud, Mistake, Condition of Mind.

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

This rule, which "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules," 5 Wright & Miller, Federal Practice and Procedure: Civil § 1297 at 405, generally serves two important purposes. First, it assures the defendant of " 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978) (quoting *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir. 1971)). *See* 5 Wright & Miller, *supra*, at 403–404 ("It is the pleading of these matters with precision that serves the rule's purpose by apprising the defendant of the claim against him and of the acts relied upon as constituting the fraud charged.") Secondly, the specificity requirement grows out of "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing . . . ." *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir. 1972). In the context of securities litigation Rule 9(b) serves an additional important purpose. It operates to diminish the possibility that " 'a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably

founded hope that the process will reveal relevant evidence . . . .' " *Denny v. Barber, supra*, 576 F.2d at 470, (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)).[20]

In *Segal v. Gordon, supra*, the court held: "Mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b–5 are insufficient"; Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 444 (2d Cir. 1971) . . . "[I]t is now quite clear in this Circuit that allegations with respect to 10b–5 violations will not pass scrutiny if they do not allege with some specificity the statements allegedly constituting the fraud." *Matheson v. White Weld & Co.*, 53 F.R.D. 450, 452 (S.D.N.Y.1971).

467 F.2d at 607. Similarly, in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 378 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), the court indicated that a complaint which merely alleged that the defendants engaged "in a course of business which operated as a fraud and deceit on the purchasers and holders of . . . stock" would be insufficient under Rule 9(b). *Accord, Denny v. Barber, supra*, 576 F.2d at 470.

These decisions taken together establish that a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests. It will not do merely to track the language of Rule 10b–5 and rely on such meaningless phrases as "scheme and conspiracy" or "plan and scheme and course of conduct to deceive." A defendant is entitled to a reasonable opportunity to answer the complaint and must

---

**20.** Of course, Rule 9(b) cannot be viewed in vacuo.

The requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives . . . of Rule 8 that the pleadings should contain a "short and plain" statement of the claim or defense and with each averment should be "simple, concise and direct." Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter.

2A Moore's Federal Practice, ¶ 9.03 at 1929–30. *See* 5 Wright & Miller, Federal Practice and Procedure: Civil § 1298 at 406. (Rule 9(b) does not render general principles of Rule 8 inapplicable to pleadings alleging fraud). The Second Circuit has very recently expressed this same view that "F.R.Civ.P. 9(b) must be reconciled with F.R.Civ.P. 8(a)(2) . . . ." *Denny v. Barber, supra*, 576 F.2d at 467.

be given adequate information to frame a response.

There is no question that the plaintiffs in this instance adequately identified the alleged "misrepresentations." They point to the following specific documents: 1970 Annual Report (Complaint ¶ 15); 1971 Annual Report (*Id.* ¶ 16); prospectus issued in or about March 1972 (*Id.* ¶ 17); 1972 form 10–K (*Id.* ¶ 22); 1973 form 10–K (*Id.* ¶ 23); press release issued on or about April 19, 1973 (*Id.* ¶ 25); press release issued July 18, 1973 (*Id.* ¶ 27); press release dated January 31, 1974 (*Id.* ¶ 28); 1973 Annual Report (*Id.* ¶ 30); and finally a press release dated April 18, 1974 (*Id.* ¶ 32). However, we believe that the pleading is deficient in other important respects.

The complaint alleges only in a most sketchy fashion circumstances which would give rise to an inference of fraud. The complaint sets forth numerous facts which, it is alleged, indicate that "there were serious questions as to the safety and efficiency of the Dalkon Shield . . . ." (Complaint ¶ 18). Some, but not all, of these facts are alleged to have been contained in a 1972 unpublished report on the Dalkon Shield prepared by a Mary Gabrielson. It is not indicated what relationship, if any, exists between Mary Gabrielson and Robins, or whether plaintiffs have any reason to believe that the defendants were even aware of the report's existence. Plaintiffs also indicate that the defendants' knowledge of the facts contained in paragraph 18 is evidenced by "among other things" the 1972 unpublished report. Plaintiffs should indicate whether they are relying solely on the study or have other reasons to believe that the defendants had knowledge of facts raising serious questions about the efficiency of the Dalkon Shield. Additionally, knowledge of many of the facts alleged in paragraph 18, *e. g.,* the number of deaths, septic abortions and other complications resulting from the Dalkon Shield in 1972–1973, is in no way attributed to the defendants.

Plaintiffs have also failed to indicate when the defendants allegedly came into possession of this crucial information. No one disputes that the defendants eventually became aware of major safety problems involving their product. The facts alleged in paragraph 34—that by letter dated May 8, 1974 Robins informed approximately 120,000 physicians nationwide that severe complications including death had resulted in instances where the Dalkon Shield remained in place during pregnancy—do give rise to the inference that by 1974 officials at Robins were aware that major medical problems existed. However, it is only if the defendants' knowledge of various problems with the Dalkon Shield coalesced into a duty to disclose prior to July 1973 (the time when the named plaintiffs bought stock in Robins) that the action can be prosecuted as a class action by these named plaintiffs. We believe that it is proper to require the plaintiffs, even at the pleading stage, to fix more definitively the time at which these crucial events in the complaint occurred.

■ As indicated above, although Rule 9(b) requires that "circumstances constituting fraud . . . shall be stated with particularity" it provides that "[m]alice, intent, *knowledge,* and other condition of mind of a person may be averred generally." (emphasis added). Of course, defendants' awareness of the facts alleged by the plaintiffs in paragraph 18 indicating that there were serious questions about the safety and efficacy of the Dalkon Shield is central to plaintiffs' Rule 10b–5 claim. However, at this stage of the litigation, we cannot realistically expect plaintiffs to be able to plead defendants' actual knowledge. On the other hand, plaintiffs can be required to supply a factual basis for their conclusory allegations regarding that knowledge. It is reasonable to require that the plaintiffs specifically plead those events which they assert give rise to a strong inference that the defendants had knowledge of the facts contained in paragraph 18 of the complaint or recklessly disregarded their existence. And, of course, plaintiffs must fix the time when these particular events occurred.

Finally, the complaint is deficient in that it fails to specify the time period during which Robins' stock allegedly fell from $19 a share to $13 a share. (Complaint ¶ 45). Absent such a statement, including a claim that the stock has not, since it was acquired, risen above $19 a share, it is impossible to determine whether the named plaintiffs or any members of the proposed class have any viable claim that they sustained a loss due to defendants' alleged misconduct.

However, notwithstanding the deficiencies which exist in the pleading, we believe, as we indicated at the outset, that plaintiffs should be given a final chance to replead.

## CONCLUSION

For the reasons set forth above, the decision of the district court is reversed. The cause is remanded.[21]

---

21. We do not reach the question whether the defendants' alleged failure to update and correct prior statements which were accurate when made constitutes conduct actionable under § 10(b) and Rule 10b–5. In view of the fact that we are sustaining the determination of the district court that the complaint is deficient because it fails to particularize allegations of fraud, we believe it would be premature for us to address this issue at the present time.