631 F.2d 169
 Fed. Sec. L. Rep. P 97,631
Jane S. W. CANFIELD and William Douglas Burden, as Trustees
U/A/F/B/O William Douglas Burden, Jr., and William
Douglas Burden, Jr., Plaintiffs-Appellees,
v.
William G. REYNOLDS, Defendant-Appellant,
Paul Belmont, Michael Santangelo and Highway Safety
Materials Corporation, Defendants.
 No. 1099, Docket 79-7788.
 United States Court of Appeals,
Second Circuit.
 Argued April 2, 1980.
Decided Sept. 9, 1980.
 
 Victor A. Kovner, New York City (Wayne N. Outten, Harriette K. Dorsen, Lankenau Kovner & Bickford, New York City, on the brief), for defendant-appellant.
 William C. Viets, New York City (Lola S. Lea, Trubin Sillcocks Edelman & Knapp, New York City, on the brief), for plaintiffs-appellees.
 Before MANSFIELD and KEARSE, Circuit Judges.*
 KEARSE, Circuit Judge:
 
 
 1
 William G. Reynolds appeals from a judgment of the United States District Court for the Southern District of New York, Richard Owen, Judge, granting to plaintiffs Jane S. W. Canfield and William Douglas Burden ("the trustees"), and William Douglas Burden, Jr. ("Burden"), rescission of an agreement to purchase from Reynolds 25,000 shares of the stock of Highway Safety Materials Corporation ("HSM").[1] The controversy centers on an undertaking by Reynolds, given at the time of sale, to cause HSM to file with the Securities and Exchange Commission ("SEC") a registration statement covering the stock purchased by Burden. No such filing was ever made; the district court held that Reynolds had therefore breached the contract of sale. The court held also that Reynolds had violated § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1976), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (1980), by failing to disclose, at the time of sale, that he did not intend to cause a registration statement to be filed unless certain conditions favorable to a public underwriting were met. The court then found that damages could not be ascertained "with reasonable certainty," and granted plaintiffs rescission.
 
 
 2
 For the reasons below, we affirm the district court's determination that Reynolds breached the contract of sale, but reverse the finding of Rule 10b-5 liability. Since we also find that Burden is not entitled to rescission, we remand for a determination of damages.
 
 
 3
 * The mise en scene of this controversy is the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77a et seq. (1976). Broadly speaking, that Act prohibits the sale of securities to the public unless a registration statement covering the securities has been filed with and declared effective by the SEC. 1933 Act §§ 5, 4(1), 15 U.S.C. §§ 77e, 77d(1) (1976). See generally SEC v. North American R. & D. Corp., 424 F.2d 63 (2d Cir. 1970). Under Schedule A of the 1933 Act, 15 U.S.C. § 77aa (1976), and the applicable SEC regulations, the registration statement must include, along with various detailed disclosures concerning the issuer, a description of the plan of distribution by which the securities will be marketed. The most common form of distribution to the public involves an underwriting by investment bankers. See Jennings & Marsh, Securities Regulation 21-22 (4th ed. 1977).
 
 
 4
 Obviously, a prohibition against sales to the public severely restricts a security's marketability. Thus, the purpose of a promise to register stock-such as that at issue here-is generally to enhance the marketability, and hence the value, of that stock. A crucial consideration, with respect to such a promise, is the question of who must bear responsibility for developing the plan of distribution. With this setting in mind, we turn to the facts of this case.
 
 A. HSM
 
 5
 HSM was formed in June 1969 to exploit mineral rights that Reynolds held in 90,000 acres of land near Brownsville, Kentucky. This land contained, among other things, deposits of rock asphalt, "heavy oil," silicone and coal. Reynolds acquired the mineral rights in the late nineteen-fifties, and subsequently formed Gripstop Company, which produced asphalt for use in paving highways. Gripstop apparently had little success; HSM was Gripstop's successor, and was apparently intended to be a somewhat more ambitious venture.
 
 
 6
 Shortly after HSM was formed, Reynolds and two associates, Paul Belmont and Michael Santangelo, began to look for outside financing, and investigated a number of different possibilities. First, Belmont and Santangelo sought to arrange for a public offering of HSM stock. On August 1, 1969, Tobey & Kirk, a New York investment firm, provided HSM with a nonbinding letter of intent, expressing its willingness to act as principal underwriter for a public offering of 250,000 shares of HSM stock at $8 per share. Second, HSM representatives explored the possibility of forming joint ventures with other companies to exploit various of the mineral deposits. In September 1969, HSM obtained a letter of intent from Major Oil Corporation, expressing interest in a joint venture to extract "heavy oil," and a letter of intent from Demag Elektrometallurgie concerning a joint venture to produce silicone. Finally, in late September 1969, HSM began to negotiate for an investment by Chemical Bank. The negotiations culminated in an agreement by the bank, executed on November 24, 1969, to lend HSM $400,000 at 8% interest, convertible into HSM stock at a price of $4 per share. The loan agreement provided that Chemical Bank could designate one director on the HSM board. It also provided that HSM would use its "best efforts" to register with the SEC any HSM stock that Chemical Bank obtained thereunder.[2] When it secured the loan from Chemical Bank, HSM determined to postpone any public offering for at least a year.
 
 
 7
 The first HSM stock was issued in November 1969. The HSM board of directors met in New York on November 7 and accepted two subscription offers for the stock. Under the first, Reynolds purchased 12,500 shares for $50,000. Under the second, Reynolds and Santangelo received 694,000 and 173,500 shares, respectively, in exchange for a deed to the company of certain of the Brownsville mineral rights, and an option to purchase the balance of those rights. None of the stock issued at this time was registered with the SEC; it was therefore not readily marketable. In connection with the second subscription, however, the HSM board passed the following resolution:
 
 
 8
 RESOLVED: That the Company hereby agrees to prepare and file one registration statement at any time after January 1, 1971, to be filed with the Securities and Exchange Commission to cover a public offering of such 867,500 shares of Capital Stock for the account of the holders of such stock on condition that the Company receive written request for such registration by the holders of not less than fifty percent (50%) of said 867,500 shares, such registration to be at the expense of such holders.
 
 
 9
 Reynolds has at all times held more than 50% of the 867,500 shares issued pursuant to the second subscription. Thus, it has always been within Reynolds' power to require HSM to prepare and file a registration statement covering those shares.
 
 B. Burden's involvement with HSM
 
 10
 Burden first became interested in HSM after meeting Belmont and Santangelo in August 1969. Burden had previously worked on and invested in a number of venture capital projects, including several mining ventures, although none of the latter had involved the kinds of mineral deposits that HSM intended to exploit. Burden and the HSM representatives were soon discussing the possibility of Burden's becoming president of, and acquiring stock in, HSM. On August 28, Burden traveled to Richmond, Virginia and conferred with Reynolds about HSM and its prospects. By the middle of October, Burden had become substantially involved in HSM affairs, and had begun to act as president of the corporation. In October and November, Burden went to Brownsville, Kentucky to view the property and confer with the company's employees. During this period Burden also met with representatives of Major Oil to discuss the proposed "heavy oil" venture, and corresponded with Demag Elektrometallurgie and Union Carbide about the possibility of silicone production.
 
 
 11
 In late November, Burden agreed to purchase 25,000 shares of the unregistered HSM stock from Reynolds for $4 per share.[3] In considering this investment, Burden was advised by his attorney, Sidney Rosoff, and by his investment advisors at Train, Cabot & Associates. Rosoff and Train, Cabot reviewed copies of the Chemical Bank loan closing file, certified HSM financial statements as of November 7, 1969, and the Tobey & Kirk letter of intent. Rosoff also obtained a copy of the HSM board resolutions concerning the issuance of shares to Reynolds.
 
 
 12
 In connection with Burden's purchase, the parties exchanged several documents which are of central importance to this case. First, Burden signed an investment letter dated November 25, 1969, stating that he was purchasing the stock "for investment, and not with a view to ... distribution," and that he had "made a full investigation of the Company, its properties and proposed operations." The letter also stated:
 
 
 13
 It is my understanding that the shares which I am purchasing are covered by an agreement on the part of the Company to register such shares with the Securities and Exchange Commission on or after January 1, 1971.
 
 
 14
 At the time he signed the investment letter, Burden received a form letter from Reynolds,[4] dated November 29, 1969, which had been drafted by John J. Howard, counsel to HSM who was acting as Reynolds' attorney. Reynolds' letter read, in its entirety, as follows:
 
 
 15
 This day I have sold to you for purposes of investment 25000 shares of capital stock of Highway Safety Materials, Inc. I represent to you that the Company has agreed to register these shares with the Securities and Exchange Commission at any time on or after January 1, 1971 upon my written request and at the expense of the Company. I covenant and agree that I will give notice to the Company on January 2, 1971 to prepare and file such registration statement covering my shares of stock of the Company and yours as well.
 
 
 16
 Finally, Burden received from HSM a lengthy private placement memorandum, dated November 26, 1969, which contained the following statement:
 
 
 17
 The Board of Directors has made preliminary investigation into the matter of securing an underwriter for the purpose of a public offering of securities of the Company. As of this date, no agreement has been reached with any underwriter and there is no assurance that any such agreement will be entered into.
 
 
 18
 Although he had not disclosed the fact to Reynolds, it appears that Burden at all times intended to pay for the 25,000 shares with funds from a trust of which he was the income beneficiary. Nearly all of the trust's assets were invested in publicly-traded securities, and were therefore highly liquid. At trial, both burden and Rosoff testified that they were concerned with maintaining this liquidity, and that they therefore placed great importance on representations made by Reynolds and his associates that the stock would be registered and thus made marketable. The trustees eventually approved the purchase, and paid Reynolds $100,000 from the trust for the stock.[5]
 
 
 19
 The HSM board met in Miami on December 6, and Burden was elected president and a director of the corporation at an annual salary of $25,000. Within months, however, Burden and Reynolds had a falling out, and Burden was removed from the presidency in May 1970. Burden nevertheless retained his HSM stock.
 
 C. The failure to register
 
 20
 At the December 6, 1969, board meeting, the directors also discussed the registration rights of the shareholders, including Burden, who had purchased their stock from Reynolds. Richard Ader, the director designated by Chemical Bank, was apparently somewhat concerned about those rights. Ader testified at trial that it was his understanding, at the time, that Burden had been given the right to cause HSM to prepare a registration statement even if there was no plan of distribution. Ader felt that such a registration statement would serve little purpose, because even if it could be filed the shareholders would have no means by which to dispose of their shares. Accordingly, Ader expressed the view that HSM should not incur the expense of preparing a registration statement until a plan of distribution, covering the shares to be sold, had been developed.
 
 
 21
 Reynolds and his associates, for their part, expected to find and retain investment bankers willing to underwrite a public offering of HSM stock. Throughout 1970 and into early 1971, Belmont met with a number of investment banking firms to solicit their participation in such an underwriting. Tobey & Kirk, which had earlier given the letter of intent, continued to express interest in taking the role of lead underwriter, but repeatedly told Belmont that the offering should be postponed until market conditions improved. Belmont also asked the firm of Paine, Webber, Jackson and Curtis to act as lead underwriter. Paine, Webber declined to take the lead role, although it did express interest in participating. It does not appear that Belmont solicited any other firm to act as lead underwriter; the other firms he spoke with were simply invited to participate in the offering. More important, it appears that no consideration was ever given to lowering the proposed offering price below the $8 per share figure settled upon in the summer of 1969.
 
 
 22
 As time went on, HSM's financial position deteriorated. The "heavy oil" and silicone ventures were never commenced, and the first mineral exploitation-coal mining-did not get under way until late 1970 or early 1971. Meanwhile, the market for new issues of equity securities was drying up. For these and perhaps other reasons, the prospects for a public offering of HSM stock continued to grow dimmer. The HSM board discussed the problem briefly at each of its meetings. Reynolds apparently continued to want HSM to prepare a registration statement; Ader continued to maintain that no statement should be prepared in the absence of a plan of distribution. Ader's view prevailed.
 
 
 23
 January 2, 1971, passed without Reynolds' giving HSM the notice promised in his November 26, 1969, letter to Burden. On January 25, 1971, Burden and the trustees sent a letter to Reynolds, demanding that Reynolds cause HSM to prepare and file a registration statement covering Burden's shares. Reynolds presented this letter to the HSM board, but no action was taken. In the spring of 1971, HSM fell into default under the terms of the Chemical Bank loan, and became virtually insolvent. In August of that year, HSM sent a letter to its shareholders, offering to file a registration statement for any shareholder who could come forward with a plan of distribution for the shares to be covered by the statement. No shareholder responded. No registration statement was ever filed.
 
 D. The proceedings below
 
 24
 Burden and the trustees commenced this action in October 1972. The complaint alleged that Reynolds, Belmont and Santangelo had violated § 10(b) of the 1934 Act and Rule 10b-5 by misrepresenting both the value of the HSM stock and their intentions with respect to registration of that stock; and that Reynolds had breached the contract of sale by failing to cause HSM to file a registration statement.[6] There followed a six-day bench trial.
 
 
 25
 At trial plaintiffs withdrew all of their allegations relating to the value of the HSM stock. Defendants introduced expert testimony to the effect that in the securities trade, covenants to register stock are invariably "best efforts" undertakings, rather than absolute commitments. Defendants' expert testified that in his view, the covenant that Reynolds gave to Burden was such a "best efforts" commitment, and was impliedly conditioned on HSM's being able to secure an underwriter.
 
 
 26
 The district court subsequently filed findings of facts and conclusions of law upholding plaintiffs' claims. With respect to the contract claim, the court determined that Reynolds' covenant to cause HSM to file a registration statement was not conditioned in any way, and that Reynolds' failure to cause the filing was therefore a breach of a material term of the contract of sale. With respect to the 1934 Act claim, the court's most important findings were as follows:
 
 
 27
 4. To induce the purchase, representations were made by or on behalf of Reynolds to Burden and his representative that (a) HSM had agreed that it would cause a registration statement to be filed with the Securities and Exchange Commission at the written request of Reynolds covering the stock being sold to Burden by Reynolds and (b) such a request would be made by Reynolds on January 2, 1971.
 
 
 28
 5. Burden (and the Trust) relied upon the foregoing representations and agreements in connection with the purchase of HSM stock from Reynolds, which would not have come to pass without this representation. The "covenant" of Reynolds to compel registration was therefore a material and essential part of the agreement to purchase.
 
 
 29
 6. At the time the foregoing representations were made, Reynolds did not intend to cause a registration statement to be filed unless certain conditions favorable, in his opinion, to a public underwriting were met. Reynolds did not disclose to Burden that his covenant to cause the stock to be registered was qualified by any conditions.
 
 
 30
 The court concluded that Reynolds' failure to disclose that he did not intend to cause the filing unless certain conditions were fulfilled was a failure to disclose a material fact, in violation of § 10(b) and Rule 10b-5. Finally, ruling that "damages cannot be ascertained with reasonable certainty," the court concluded that Burden was entitled to rescission of the stock purchase agreement. This appeal by Reynolds followed.[7]
 
 II
 
 31
 On appeal Reynolds argues (1) that his covenant to Burden was conditional in that it anticipated only that Reynolds would use his "best efforts" to secure an underwriter, and that the covenant therefore was fully performed; (2) that the district court erred in finding that Reynolds had violated Rule 10b-5 because the undisclosed conditional nature of Reynolds' undertaking was not a material fact, and there was no proof of an intent to defraud; and (3) that in any event Burden was not entitled to rescission, but at best made out a claim for damages. We affirm the district court's determinations that Reynolds' covenant was an absolute, rather than conditional, commitment and that the covenant was breached when HSM failed to file a registration statement. We conclude, however, that plaintiffs did not prove the scienter required to support a finding of Rule 10b-5 liability, and did not establish a right to the extraordinary remedy of rescission.A. The nature of Reynolds' covenant
 
 
 32
 In arguing that the covenant should be construed as conditional in nature, calling only for his "best efforts" to secure an underwriter, Reynolds contends that one must infer from the circumstances surrounding the sale, and from custom and usage in the securities business, that the parties intended that the covenant be so conditioned. We conclude that the district court's finding that the parties did not so intend was not clearly erroneous.
 
 
 33
 Reynolds' principal argument is that everyone involved in the start-up of HSM-including Burden-contemplated that the registration statement to be filed would cover a public offering; that as a practical matter, an underwriter is necessary for such an offering to be successful (and may even be necessary before the SEC will declare the registration statement effective); that everyone knew, at the time Burden purchased his stock, that a firm commitment had not yet been obtained from any underwriter; and that one must conclude, from the foregoing, that the parties intended Reynolds' obligation to become binding only if and when an underwriter were secured. The flaw in this argument is that its conclusion is a non sequitur. The parties would have intended a conditional, "best efforts" covenant only if they intended that the risk of not securing an underwriter would be borne by Burden. There is, however, no inherent reason why that risk could not have been contractually assumed by Reynolds. The plain and unconditional language of the covenant, drafted by Reynolds' counsel, would indicate that the parties did intend Reynolds to assume that risk.
 
 
 34
 The district court was clearly of the view that if Reynolds had intended to make only a "best efforts" commitment, the covenant would have explicitly reflected that fact. There is sufficient evidence in the record to support this conclusion. First, there was the fact that the Chemical Bank loan agreement, closed the day before Burden purchased his shares, was explicit in committing HSM only to use its "best efforts" to register any stock acquired by the bank under the agreement. Moreover, there was the testimony of Burden and his attorney, Rosoff, who stated that it was their understanding, based on various representations made by Reynolds and his associates, that Reynolds' covenant was absolute in nature. The district court apparently credited the testimony of these witnesses.[8] Further, Howard, who had drafted Reynolds' letter and conducted negotiations on behalf of Reynolds, testified that he did not recall mentioning to Burden or Rosoff any qualification as to the covenants of HSM or Reynolds. The conclusion that Reynolds, as well as Burden, viewed the covenant as unconditional was also supported by Ader, Chemical Bank's representative on the HSM board of directors. Ader, called as a witness by Reynolds, testified that he thought Reynolds had, in effect, committed HSM to preparing a registration statement whether or not an underwriter was found; Ader therefore felt compelled, at the December 6, 1969, board meeting, to tell the other directors that he opposed preparation of a statement unless an underwriter was secured. If Reynolds had believed that his covenant required only "best efforts," rather than being an absolute obligation, it would have been a simple matter to so inform Ader, and thereby alleviate the latter's concern that HSM would be compelled to expend a substantial sum to prepare a useless statement. There is no evidence of any such disclaimer.
 
 
 35
 Finally, we find no merit in Reynolds' contention that the covenant was inherently limited by a "best efforts" condition because custom and usage in the securities field is to treat covenants to register securities as "best efforts" commitments. Reynolds quotes to us the following passage from Lipsky v. Commonwealth United Corp., 551 F.2d 887, 896 (2d Cir. 1976):"Best efforts" registration clauses are common and are significant. Due to the nature of the securities business and the vagaries of the SEC, registration can never be guaranteed, but in the usual case a "best efforts" clause is as close to a guarantee of registration as any careful seller is willing to give.
 
 
 36
 But this passage proves too much: best efforts clauses are common, and the careful seller includes such a clause in an undertaking to register stock. We see no necessity to draw the same inference from the absence of such a clause as we would from its presence.
 
 
 37
 From all of the foregoing, we conclude that the district court correctly determined that Reynolds' covenant was not qualified in any way, and that Reynolds had assumed the risk that a public offering would not come about. The mere fact that this undertaking may have become burdensome, as a result of subsequent, perhaps unanticipated, developments, does not operate to relieve Reynolds of his obligation. See 407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp., 23 N.Y.2d 275, 281-82, 296 N.Y.S.2d 338, 343, 344, 244 N.E.2d 37, 41-42 (1968). It follows that Reynolds breached his covenant when HSM failed to file a registration statement covering Burden's shares.[9]
 
 B. Rule 10b-5 liability
 
 38
 It is now well settled that scienter is a necessary element of a cause of action under Rule 10b-5. Thus the plaintiff must prove an intention on the part of the defendant to deceive, manipulate or defraud the plaintiff. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Ross v. A. H. Robins Co., 607 F.2d 545, 555-56 (2d Cir. 1979); cert. denied, --- U.S. ----, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). In the present case the district court found, in effect, that Reynolds knowingly and intentionally failed to disclose that he did not intend to cause a registration statement to be filed unless certain conditions favorable to a public offering were met. Despite Reynolds' arguments that these conditions were implicit in his covenant, we conclude that the evidence of record does not support this finding. Accordingly, we reverse the district court's ruling that Reynolds violated Rule 10b-5.
 
 
 39
 We have already adverted to evidence showing that Reynolds believed that the registration covenant was an absolute commitment. However, there is no indication in the record that Reynolds did not intend, at the time of the sale to Burden, to honor that commitment. At the December 6, 1969 board meeting, when Ader questioned the wisdom of Reynolds' having granted registration rights to his purchasers, Reynolds simply responded that he and Belmont would secure an underwriter. At subsequent board meetings Reynolds made clear that in light of his commitment to his purchasers, he continued to desire that the registration eventually take place. Although the absolute commitment that Reynolds gave proved imprudent in light of HSM's subsequent difficulties, at the time it was given HSM's prospects apparently seemed much brighter: HSM had in hand Tobey & Kirk's letter of intent expressing interest in underwriting a public offering, as well as letters of intent relating to joint ventures to produce "heavy oil" and silicone, and it had just obtained the $400,000 loan from Chemical Bank. The mere fact that a registration statement was not filed in January 1971, casts little or no light on Reynolds' intentions in late 1969. Neither the district court nor Burden has pointed us to any other evidence that would suggest that Reynolds did not fully intend to honor his commitment, at the time he gave it.[10] We therefore conclude that the district court's finding of fraudulent intent cannot stand and that the holding of Rule 10b-5 liability must be reversed.
 
 C. Remedy
 
 40
 The remaining question is whether Burden is entitled to rescission as a consequence of Reynolds' breach of contract. Rescission is an extraordinary remedy, appropriate only where the breach is found to be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Callanan v. Powers, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910). See Nolan v. Sam Fox Pub. Co., 499 F.2d 1394 (2d Cir. 1974). Rescission is not appropriate where the failure "was not a breach going to the root of the contract," Direction Associates, Inc. v. Programming and Systems, Inc., 412 F.Supp. 714, 719 (S.D.N.Y.1976); see also Schwartz v. National Computer Corp., 42 App.Div.2d 123, 345 N.Y.S.2d 579 (1973).
 
 
 41
 In the present case we conclude that the failure to register was not so fundamental a breach as to vitiate the entire contract. The basic purpose for which Burden purchased his stock was to share in the potential growth of HSM. Before he made any investment, Burden conducted an extensive investigation of the company and it operations, and became actively involved in its affairs. He purchased his stock only after satisfying himself that HSM's prospects were good. Moreover, although Burden preferred that a registration take place, so that the stock would become marketable, a registration would have been of little value if the company's operations were not successful. We cannot escape the conclusion that burden purchased the stock principally for investment.
 
 
 42
 This investment purpose was to a large extent satisfied, and we cannot view the subsequent failure to register the stock as "a breach going to the root of the contract." Rescission is therefore unwarranted, and indeed, would give Burden a windfall: by reason of his purchase of HSM stock, Burden obtained a chance to profit from any success that HSM might have enjoyed; there is no sound reason to relieve him of his investment's downside risks.
 
 
 43
 Burden is, of course, entitled to any damages he may have suffered by reason of the failure to register. We see no basis for the district court's conclusion that damages could not be ascertained with reasonable certainty; courts are often called upon to value non-publicly traded securities, e. g., Affiliated Ute Citizens v. United States, 406 U.S. 128, 154-156, 92 S.Ct. 1456, 1472-1473, 31 L.Ed.2d 741 (1972), and we see nothing in the instant case that would preclude such a determination here. Accordingly, we remand for further proceedings consistent with this opinion. No costs.
 
 
 
 *
 Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Mansfield and Kearse, who are in agreement on this opinion
 
 
 [1]
 Canfield, Burden, Sr., and Chemical Bank were trustees of a trust of which Burden, Jr., was the income beneficiary. The shares in question were paid for by the trust, but were issued in the name of Burden, Jr. Since all three individuals are plaintiffs, we need not concern ourselves (any more than have the parties or the court below) with the questions of where ownership actually lies, or who is the proper party to pursue claims arising out of the purchase. For convenience, we shall refer to Burden as the purchaser
 
 
 [2]
 The loan agreement provided, in relevant part:
 If at any time on or before October 15, 1974, you shall request the Company to effect the registration under the Securities Act of the Notes then held by you or of a number of shares of Common Stock of the Company acquired by you pursuant to Article IV hereof equal to at least 50% of the number of shares of Common Stock which holders of Notes could then acquire pursuant to Article IV (assuming for this purpose that there were no conversions prior to that time), the Company shall, as expeditiously as possible (subject to reasonable delay in availability of financial statements), use its best efforts to effect the registration under the Securities Act of such Notes or such shares of Common Stock (together with such additional shares of Common Stock as you may have acquired by such time from William G. Reynolds, Sr.) for disposition in accordance with the intended method of disposition described in your request.
 
 
 [3]
 Burden's purchase was part of a larger private placement, in which eight persons purchased a total of 121,500 shares from Reynolds
 
 
 [4]
 The letter was signed by Reynolds' son, acting under a power of attorney, because Reynolds, at the time, was recuperating from a heart attack and unable to work
 
 
 [5]
 Chemical Bank, the third trustee, see note 1, supra, refused to approve the purchase until it received letters from the other trustees approving the purchase and agreeing to indemnify the bank, and a letter from Burden himself approving the purchase. With these letters in hand, the bank's approval was given subject to its receiving an additional indemnity agreement from the donor of the trust. The donor's approval was given in a letter to the trustees dated January 3, 1970
 
 
 [6]
 The complaint also asserted a derivative claim on behalf of HSM, charging that Reynolds, Belmont and Santangelo had misappropriated the property of HSM for their personal use and benefit. The district court ruled that plaintiffs did not carry their burden of proof on this claim. They have not appealed from that determination
 
 
 [7]
 Reynolds had interposed a counterclaim, alleging that, in addition to the 25,000 shares, Burden had agreed to purchase 6250 shares of HSM stock for which he had failed to pay. The district court ruled that Reynolds did not carry his burden of proof on this claim. Reynolds has not pursued this claim on appeal
 
 
 [8]
 Reynolds' argument that a "best efforts" covenant would still have been of substantial value to Burden at the time he purchased his shares, simply misses the mark. An absolute commitment to register the shares would have been of even greater value, and the record supports the district court's conclusion that Burden in fact obtained such an unconditional commitment
 
 
 [9]
 The district court did not reach the alternative question, if the covenant was conditional as Reynolds contends, of whether Reynolds in fact used his best efforts to secure an underwriter. We similarly do not reach this question, but we note in passing that there was no evidence that more than two firms were solicited to act as lead underwriter, and no evidence that any offering price below $8 per share was ever discussed
 
 
 [10]
 Burden has placed considerable reliance on what his brief calls a "contemporaneous memorandum" of a conversation between Reynolds' son and Reynolds' attorney, in which the son apparently suggested that they pretend to proceed with a registration statement but not do so because of expense and "impracticality." The memorandum may indeed have been contemporaneous with the conversation, but the conversation took place in November 1971, two years after the sale to Burden. While the memorandum has an unfortunate aura of duplicity in 1971, it does not appear to shed any light on the question of what Reynolds thought or intended in late 1969, when he sold the stock to Burden and when the "impracticality" was unforeseen