**T.E.A.M. ENTERTAINMENT, INC., Plaintiff,**

v.

**Ashanti DOUGLAS and Tina Douglas, Defendants.**

**No. 04 Civ. 1552(JSR).**

United States District Court, S.D. New York.

March 29, 2005.

---

Harry P. Cohen, Cadwalader, Jasmine Khalili, Matthew D. Grant, Cadwalader, Wickersham & Taft LLP, New York, NY, for Plaintiff.

Harry M. Stokes, Granite Springs, NY, for Defendants.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

Plaintiff T.E.A.M. Entertainment ("T.E.A.M."), a company specializing in the production of hip-hop and rhythm-and-blues music recordings, has sued singer Ashanti Douglas ("Ashanti") and her manager mother, Tina Douglas, alleging two counts of breach of contract and one count of unjust enrichment. Defendants now move for summary judgment on all three claims. For the reasons that follow, the motion is denied.

The pertinent facts, taken most favorably to plaintiff, are as follows:

In or around June 1996, when Ashanti was sixteen years old, defendants approached Genard Parker, T.E.A.M.'s owner, seeking T.E.A.M.'s services as part of defendants' attempts to secure a recording contract with a major record label. *See* Deposition of Genard Parker, September 1, 2004 ("Parker Dep."), at 15–18. Plaintiff agreed to work with defendants and did so, without a written contract, through February 18, 1997. *Id.* at 17–25.

On February 18, 1997, plaintiff and defendants signed an interim production agreement ("First Production Agreement"). *See* Letter from Ashanti Douglas and Tina Douglas to Genard Parker, dated February 18, 1997, attached to Defendant's Rule 56.1 Statement of Material Facts Not In Dispute ("Def. 56.1") as Ex. C. This two-page agreement acknowledged that plaintiff had produced three songs (the "masters") that Ashanti intended to use in her efforts to secure a recording contract and provided for a general scheme of compensation to plaintiff related to any such contract defendants might sign.

Between February 1997 and June 1997, Ashanti recorded additional demonstration recordings ("Demos") at plaintiff's studio. Defendants also met with representatives of different record labels during this time but did not sign a recording contract with any of them. *See* Deposition of Ashanti Douglas, August 11, 2004 ("Ashanti Dep."), attached as Ex. B to Declaration of Matthew D. Grant in Opposition to Defendants' Motion for Summary Judgment, dated September 27, 2004 ("Grant Decl."), at 49–51.

On June 18, 1997, plaintiff and defendants signed another agreement ("Second Production Agreement") that superseded the First Production Agreement. *See* Letter from Genard Parker to Ashanti Douglas, dated June 18, 1997, attached to Def. 56.1 as Ex. D. In relevant part, this twelve-page contract provided that Ashanti would provide her personal services exclusively to T.E.A.M. for the duration of the contract, which had an initial term of six months with various opportunities for extensions. *Id.* ¶¶ 1(a), 3, 18. For its part, T.E.A.M. would "endeavor to secure a record distribution agreement" ("Recording Agreement") with a major record label. *Id.* ¶ 2. Ashanti retained the right to approve any record label except Volcano Records, which the contract pre-approved. *Id.* Tina Douglas warranted that Ashanti would perform all of her obligations under the Second Production Agreement and assumed personal liability for this performance. *Id.* at 11–12.

In June or July of 1997, plaintiff secured an offer of a recording contract for Ashanti from Volcano Records, but no written agreement was ever executed. *See* Parker Dep. at 40–42. In September of 1997, defendants told plaintiff that they wanted to be released from the Second Production Agreement so that they could pursue a relationship with a company called Noontime Music, Inc. ("Noontime"), a competitor of plaintiff. *Id.* at 44–46. In a seven-page written release agreement ("Release Agreement") signed on October 21, 1997, the parties "agree[d] to amend" the First and Second Production Agreements in a

series of ways. *See* Letter from Ashanti Douglas and Tina Douglas to Genard Parker dated October 21, 1997, attached to Def. 56.1 as Ex. F, at 1. Specifically, the parties agreed to suspend the term of the Second Production Agreement for the sooner of thirty days or until Ashanti signed an exclusive recording agreement with Noontime (the "Noontime Agreement"). *Id.* ¶ 1(a). If no Noontime Agreement were signed within thirty days from the date of the Release Agreement, then the term of the Second Production Agreement would continue, with a thirty-day extension. *Id.* ¶ 1(b). If Ashanti entered into the Noontime Agreement, then the First and Second Production Agreements would "terminate and expire" as of the date of execution of the Noontime Agreement, the parties would release each other from obligations under those earlier agreements, and the rest of the Release Agreement would govern the rights and obligations between plaintiff and defendants. *Id.* ¶¶ 1(c), 4.

To compensate plaintiff for giving the release, the Release Agreement further provided that, if a Noontime Agreement were entered into, plaintiff would be entitled to share to an extent in the proceeds of Ashanti's first three albums recorded pursuant to the Noontime Agreement. For the first album, plaintiff would be paid "an all-in recording fund" of $25,000 for each of two master recordings, half of which would be payable at the beginning of recording and the other half of which would be payable upon the delivery of the recordings to Noontime and Noontime's subsequent acceptance of the them. Release Agreement, ¶ 2(A)(a). If plaintiff were asked and agreed to produce additional master recordings for the first album, plaintiff would receive an additional but pro-rated all-in recording fund. *Id.* ¶ 2(A)(b). "Subject to [T.E.A.M.'s] full and timely performance of [its] production obligations hereunder, and provided [T.E.A.M. were] not in breach of any of [its] material obligation to [defendants] or Noontime," defendants would instruct Noontime and its distributor to pay royalties to plaintiff according to a certain percentage scheme for all recordings sold through United States Normal Retail Channels. *Id.* ¶ 2(A)(c). As for any second and third albums that might be recorded pursuant to the Noontime Agreement, defendants would use their best efforts to cause Noontime and its distributor to allow plaintiff to produce up to three recordings on each album according to a schedule of fees and royalties that the Release Agreement specified. *Id.* ¶ 2(A), at 3–5.[1] Once more, Tina Douglas assumed personal liability for Ashanti's performance of her obligations under the Release Agreement. *Id.* at 7.

On October 24, 1997, defendants signed an agreement with Noontime as contemplated by the Release Agreement, and Ashanti began recording songs with Noontime. *See* Letter from Noontime Music, Inc. to Ashanti Douglas dated October 24, 1997, attached to Def. 56.1 as Ex. G.; Parker Dep. at 56. By letter dated February 17, 1998, T.E.A.M. was notified of this agreement. *See* Letter from Kendall A. Minter to Genard Parker dated February 17, 1998, attached to Def. 56.1 as Ex. H. The letter said that, pursuant to the Release Agreement, the Production Agreements between T.E.A.M. and defendants were deemed terminated as of October 24, 1997, and it directed Parker to contact Noontime to "discuss the creative details regarding the masters which you have

---

**1.** This provision should really be 2(B), but the Release Agreement, in a typographical error, calls it 2(A).

agreed to produce" for Ashanti's album recorded under the Noontime Agreement. *Id.* By letter dated February 24, 1998, Parker, through his representative Laurence H. Rudolph, reported having so contacted Noontime and requested the $25,000 due him under paragraph 2(A)(a) of the Release Agreement. *See* Letter from Laurence H. Rudolph to Kendall Minter, dated February 24, 2998, attached to Grant Decl. as Ex. J. According to Parker, however, although he continued to receive telephonic assurances from Tina Douglas that T.E.A.M. would be paid according to the contract terms or otherwise compensated, the $25,000 was never in fact paid. *See* Affidavit of Genard Parker sworn to 9/24/04 ("Parker Aff.") at ¶¶ 17, 19–20.

In the meantime, Noontime entered into an agreement with Sony Music Entertainment ("Sony"), under which Sony would distribute Ashanti's albums and would pay Noontime and Ashanti an advance of $175,000. *See* Letter from Kendall A. Minter to Ronald J. Sweeney dated March 4, 1998, attached to Grant Decl. as Ex. M. But in or around July 1999, defendants terminated the Noontime Agreement because Sony had decided to "shelve" Ashanti's project. *See* Letter from Stephen Dwitt to Kendall Minter, not dated, attached to Grant Decl. as Ex. F; Deposition of Ashanti Douglas, 8/11/04 ("Ashanti Dep."), at 71. Ashanti never released an album pursuant to the Noontime Agreement.

Instead, on or about August 3, 2000, defendants entered into an agreement with a production company called AJM Records ("AJM"), another of plaintiff's competitors. *See* Defendants' Responses to Plaintiff's Requests to Admit, attached to Grant Decl. as Ex. H, at ¶ 22. Further still, in or around April 2002, AJM entered into an agreement with Murder, Inc., Records ("M.I."), a subsidiary of Universal Music Group ("Universal"), under which M.I./Universal would distribute Ashanti's albums. *See* Agreement made as of the 15th day of April, 2002, by and between M.I. Records, LLC and AJM Records, LLC, attached to Grant Decl. as Ex. O. Over the next two years, Ashanti and AJM received millions of dollars in advances from Universal and recorded songs for two albums. *See* Ashanti Dep. at 85–87; Letter from Seymour Straus, Certified Public Accountant, to Cadwalader, Wickersham & Taft LLP, not dated, attached to Grant Decl. as Ex. P, at 5. Universal released Ashanti's first album in April 2002 and her second album in July 2003. *See* Ashanti Dep., 85:13–87:3. Both albums have sold over a million copies. *Id.* Ashanti remains under contract with MI/Universal, though she is no longer under contract with AJM. *See* Deposition of Tina Douglas, 8/11/04 ("Douglas Dep."), at 114–116.

By letter dated August 8, 2003, plaintiff provided notice to defendants that the Release Agreement "is hereby deemed null and void due to your failure to make any payment, provide the opportunity to produce tracks or tender any consideration whatsoever to Mr. Parker in blatant violation of the terms and conditions of the Release Agreement." *See* Letter from Karl L. Guthrie to Tina Douglas, dated August 8, 2003, attached to Grant Decl. as Ex. Q. As a result, the letter continued, the Second Production Agreement was reinstated, and defendants were also allegedly in breach of this agreement. *Id.* Thereafter, on February 23, 2004, plaintiff filed the instant lawsuit, claiming (1) breach of the Second Production Agreement; (2) breach of the Release Agreement; and (3) unjust enrichment. *See* Complaint. Following discovery, defendants filed the instant motion, seeking summary judgment as to each of plaintiff's three claims.

■ Since plaintiff's claim that defendants breached the Second Production Agreement (Count I of the Complaint) is premised on their claim that defendants breached the Release Agreement (Count II), the Court turns to the latter claim first. Initially, defendants contend that the pleading of this claim does not meet the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, an utterly meritless argument given the very modest standards of that Rule. *See Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir.2005) (*citing Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Getting a bit more serious, defendants next argue that it is plaintiff, not defendants, who breached the Release Agreement by failing to "execute such additional agreements or documents as may be appropriate or requested to effectuate the purposes of this Agreement," Release Agreement at ¶ 3, specifically certain documents or agreements between Noontime and plaintiff necessary to effectuate the Noontime Agreement between Noontime and defendants. Plaintiff responds, however, by adducing evidence that this was because Noontime attempted to negotiate different terms between plaintiff and Noontime than those specified in the Release Agreement, so the fault was Noontime's, not plaintiff's. Although neither side's evidentiary submissions on this point are models of either clarity or consistency, there is evidence upon which a jury could decide this issue either way, and hence summary judgment must be denied.

■ Defendants' final argument for summary judgment on plaintiff's claim for breach of the Release Agreement is their contention that they, in fact, fully performed their obligations under the Release Agreement. But one of the obligations set forth in that agreement was to pay plaintiff $25,000 upon signing of the Noontime Agreement, and it was never paid. Although defendants argue that the payment should have been made by Noontime rather than by them, this is, at best, a jury question. As for the remaining $25,000 on the masters that would have been due after Noontime accepted them, and as for any additional monies owed to plaintiff based on royalties plaintiff expected under the Noontime Agreement, defendants seek to escape liability on the ground that no records pursuant to the Noontime Agreement were ever made; but this purported defense of impossibility is an affirmative defense, *see CAE Industries v. KPMG Peat Marwick,* 193 A.D.2d 470, 473, 597 N.Y.S.2d 402 (N.Y.App.Div.1993), and as such must be set forth in defendant's responsive pleading. *See* Fed. R. Civ. Proc. 8(e). "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver." *Travellers Int'l v. Trans World Airlines,* 41 F.3d 1570, 1580 (2d Cir.1994). Because defendants did not raise impossibility in their answer, it is waived. *See* Answer, April 29, 2004, attached to Def. 56.1 as Ex. B (pleading statute of limitations, release, and infancy as the only affirmative defenses).

Accordingly, defendants' motion for summary judgment on plaintiff's breach of contract claim under the Release Agreement must be denied.

Turning then to plaintiff's claim for breach of the Second Production Agreement (Count I), defendants argue that, even if a jury could find that they breached the Release Agreement (Count II), they would still be entitled to summary judgment on Count I because such a claim is prohibited by the Release Agreement, which contains a mutual release of all claims and obligations arising under both the First and Second Production Agreements. Release Agreement, ¶ 4. Plaintiff responds, however, that defendants' breach of the Release Agreement gave plaintiff the option of rescinding that

agreement and thereby nullifying the release, and that plaintiff properly invoked this option in the letter of August 8, 2003.

■ Under New York law, " 'rescission is an extraordinary remedy, appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.' " *Krumme v. West-Point Stevens Inc.*, 238 F.3d 133, 143 (2d Cir.2000) (*quoting Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980)). Here, however, there is evidence from which a reasonable juror could conclude that defendants breached the Release Agreement to this extent, in which case rescission of that agreement was appropriate.[2]

■ As for defendants' argument that plaintiff's notice of rescission of the Release Agreement was inadequate, defendants premise this argument on the provision of the Second Production Agreement that "[a]ll notices required hereunder or which either party desires to serve upon the other shall be in writing," sent to counsel for the parties, and served in one of three specific ways. Second Production Agreement, ¶ 21. Because plaintiff's notice of rescission gives no indication of having been served as required or sent to defendants' counsel, defendants argue that the notice of rescission was ineffective. Yet the Release Agreement contained no requirements for service on the parties, and it was the Release Agreement, not the Second Production Agreement, that was in effect until after the notice of rescission was given. Defendants cannot argue both

that the Second Production Agreement was superseded and that its terms should still govern. Additionally, defendants' then-counsel has testified that plaintiff's counsel contemporaneously faxed him a copy of the notice of rescission and that he discussed at some length the contents of the notice with plaintiff's counsel. *See* Minter Dep. at 96–98. Any inadequacy in service of the notice was therefore either nonexistent or waived.

■ Defendants also argue that plaintiff's claim for breach of the Second Production Agreement must fail because the six-year statute of limitations expired before plaintiff filed its complaint on February 23, 2004. Defendants base this argument on the theory that the breach on which plaintiff relies is defendants' failure to consummate a recording agreement with Volcano Records in July 1997. On this theory, the action would have to have been filed before July 2003 in order to be timely. However, plaintiff points to a more general breach of the Second Production Agreement: the requirement that Ashanti provide her personal services exclusively to plaintiff. *See* Second Production Agreement, ¶ 1(a). "Where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute [of limitations] anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring up to six years prior to the filing of the suit." *Lennon v. Seaman*, 63 F.Supp.2d 428, 446 (S.D.N.Y.1999) (*quoting Airco Alloys Div., Airco Inc. v. Niaga-*

---

2. However, plaintiff's alternative argument that rescission of the Release Agreement was proper because it did not receive any of the consideration for which it bargained under the Release Agreement is unavailing and will not be permitted at trial. *See* N.Y. General Obligations Law § 5–1103 (no consideration required "to change or modify, or to dis-

charge in whole or in part, any contract" that is in writing and signed by the party against whom enforcement is sought); N.Y. General Obligations Law § 15–303 ("A written instrument which purports to be a total or partial release ... shall not be invalid because of the absence of consideration or of a seal.").

*ra Mohawk Power Corp.*, 76 A.D.2d 68, 80, 430 N.Y.S.2d 179 (4th Dep't 1980)).

Defendants argue that there can be no such continuing breach because the term of the Second Production Agreement was explicitly limited to six months running from June 18, 1997 (i.e., through December 18, 1997), and any breach on which plaintiff relies to make the instant claim timely had to have taken place on or after February 23, 1998 (i.e. six years prior to the filing of this action). However, this argument *ignores another section* of the agreement that provides that, if Ashanti "fail[s], refuse[s], neglect[s] or [is] unable to comply" with her material obligations under the Agreement, plaintiff has a number of available options, including the right "to extend the then current Contract Period of the Term for the period of such default plus such additional time as is necessary so that Company shall have no less than one hundred fifty (150) days after completion of [Ashanti's] obligation within which to exercise its option, if any, for the next following Option Period." *See* Second Production Agreement, ¶ 18. If the Release Agreement was properly rescinded and the Second Production Agreement put back into effect, then defendants' agreements with Noontime and AJM would have violated the Second Production Agreement, which would then give plaintiff the option of extending the "then current Contract Period" under Paragraph 18. The term of the Second Production Agreement might then reasonably be construed as extending through defendants' breach, which plaintiffs argue continues to this day. Plaintiff's action would then be timely.

Accordingly, summary judgment on plaintiff's claim for breach of the Second Production Agreement must be denied.

■ Count III of plaintiff's Complaint is for unjust enrichment, based on defendants' use of plaintiff's studio and production services for the period between June 1996 and February 1997, before the parties entered into any written agreement. Contrary to defendants' argument, this claim falls within the six-year statute of limitations because a claim for unjust enrichment accrues only when the enrichment actually becomes unlawful. *See Congregation Yetev Lev D'Satmar v. 26 Adar N.B. Corp.*, 192 A.D.2d 501, 503, 596 N.Y.S.2d 435 (N.Y.App.Div.1993). Here, considerable evidence indicates that the parties understood that defendants would compensate plaintiff for the use of its facilities only once they received a contract and payment from a major record label. *See* Douglas Dep. at 45–46; Parker Aff., at ¶ 5. Defendants did not receive payment from a major record label until after March 4, 1998. *See* Letter from Kendall Minter to Ronald Sweeney, dated March 4, 1998, attached to Grant Decl. as Ex. M. Plaintiff's complaint, filed on February 23, 2004, falls within six years of that date and is therefore timely.

■ Further, defendants have not adduced evidence demonstrating that there was a written contract between the parties covering the disputed subject matter, which would preclude a claim for unjust enrichment. *See Wertheim Schroder & Co. v. Avon Prods., Inc.*, 1993 WL 126427, **15–16, 1993 U.S. Dist. LEXIS 6184, at *48 (S.D.N.Y.1993). Even if the Release Agreement were not properly rescinded, that Agreement releases liability for only those claims "related to or arising from" the First and Second Production Agreements. Release Agreement, ¶ 4. Defendants have not pointed to any provision of the First Production Agreement that could conceivably cover the recording services at issue, and the Second Production Agreement speaks only about recording in the future; it says nothing about recording that has already taken place. Second Pro-

duction Agreement, ¶ 2. Plaintiff's claim for unjust enrichment therefore withstands summary judgment.

Based on the Court's disposition of the above arguments, defendants' final argument, that this Court does not have jurisdiction in this diversity case because plaintiff's claims do not meet the minimum amount of $75,000 in controversy, is frivolous, since plaintiff has stated viable claims whose total value may far exceed this minimum. Nor are plaintiff's claims too speculative to survive summary judgment.

Accordingly, defendant's motion for summary judgment is denied in all respects. Counsel are directed to jointly telephone Chambers by no later than 5 p.m. on April 15, 2005 to schedule the trial of this case.

SO ORDERED.