## In re AMES DEPARTMENT STORES INC. STOCK LITIGATION.

**William STEINER, Nathan Spiro, Florence Spiro, David Minkoff, Goldie Jaroslawicz, Charles W. Collier, Rodney Shields, David Kahn, Sheldon Shore, Samuel H. Title, Violet Klein, Dominick T. Brancato, Anna M. Brancato, on behalf of a putative class of persons similarly situated, Plaintiffs–Appellants,**

v.

**AMES DEPARTMENT STORES, INC., Peter B. Hollis, Ralph M. Shulansky, Duane R. Wolter, James A. Harmon, Herbert Gilman, Earl M. Spector, Norman Asher, Arthur F. Loewy, Maurice Segall, Wertheim Schroder & Co. Incorporated, Defendants–Appellees.**

No. 62, Docket 92–7304.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1992.

Decided April 2, 1993.

954

Edward Labaton, New York City (Lawrence A. Sucharow, Lynda G. Jacobs, Goodkind Labaton Rudoff & Sucharow, Robert S. Schachter, Hillary Sobel, Zwerling, Schachter & Zwerling, Richard A. Fuchs, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, of counsel), for plaintiffs-appellants.

Robert I. Harwood, New York City (Wechsler, Skirnick, Harwood, Halebian, Feffer, of counsel), for plaintiffs-appellants Nathan and Florence Spiro.

Bruce Gerstein, New York City (Garwin Bronzaft Gerstein & Fisher, of counsel), for plaintiff-appellant David Minkoff.

Stuart H. Savett, Philadelphia, PA (Savett, Frutkin, Podell & Ryan, P.C., Arnold Levin, Levin, Fishbein, Sedran & Berman, of counsel), for plaintiff-appellant Goldie Jaroslawicz.

Daniel W. Krasner, New York City (Wolf Haldenstein Adler Freeman & Herz, of counsel), for plaintiff-appellant Charles W. Collier.

Richard D. Greenfield, Haverford, PA (Greenfield & Chimicles, of counsel), for plaintiff-appellant Rodney B. Shields.

Stephen D. Oestreich, New York City (Wolf Popper Ross Wolf & Jones), for plaintiff-appellant David Kahn.

Stanley R. Wolfe, Philadelphia, PA (Berger & Montague, of counsel), for plaintiff-appellant Sheldon Shore.

Harvey S. Kronfeld, Philadelphia, PA (Kronfeld, Newberg & Duggan, of counsel), for plaintiff-appellant Samuel H. Title.

Stanley M. Grossman, New York City (Pomerantz, Levy, Haudek, Block & Grossman, of counsel), for plaintiff-appellant Violet Klein.

I. Stephen Rabin, New York City, for plaintiffs-appellants Dominick T. and Anna M. Brancato.

Andrew M. Schatz, Hartford, CT (Jeffery S. Nobel, Schatz & Schatz, Ribicoff & Kotkin, of counsel), for defendants-appellees Peter B. Hollis and Duane R. Wolter.

Ralph G. Elliot, Hartford, CT (Tyler, Cooper & Alcorn, of counsel), for defendants-appellees Ralph M. Shulansky and Herbert Gilman.

Jeffrey B. Rudman, Boston, MA (William H. Paine, J. Kent Wicker, Hale and Dorr; Ralph G. Elliot, Hartford, CT, Tyler, Cooper & Alcorn, of counsel), for defendants-appellees James A. Harmon and Norman B. Asher.

Ralph G. Elliot, Hartford, CT (Tyler, Cooper & Alcorn; Jeffrey B. Rudman, Hale and Dorr, of counsel), for defendant-appellee Earl M. Spector.

Douglas H. Meal, Boston, MA (John R. Baraniak, Jr., Kenneth A. Galton, Ropes & Gray; Peter C. Schwartz, Hartford, CT, Gordon, Muir and Foley, of counsel), for defendants-appellees Arthur F. Loewy and Maurice Segall.

Lewis A. Kaplan, New York City (Jay L. Himes, David Jaroslaw, Donn Zaretsky, Paul, Weiss, Rifkind, Wharton & Garrison, Jacob D. Zeldes, Bridgeport, CT, Zeldes, Needle & Cooper, P.C., of counsel), for defendant-appellee Wertheim Schroder & Co. Inc.

Before: OAKES, KEARSE and PRATT, Circuit Judges.

OAKES, Senior Circuit Judge:

The 1988 acquisition by Ames Department Stores, Inc. ("Ames") of the discount stores division of the Zayre Corporation ("Zayre") drove Ames into bankruptcy and set off a chain of class action securities lawsuits. This action was filed by common stockholders of Ames who purchased their shares between May 10, 1989 and April 10, 1990, the day after Ames announced that it had suffered catastrophic losses for fiscal year 1990; additional consolidated class action lawsuits have been filed by purchasers of two issuances of debt securities—"reset notes" and convertible debentures—sold in 1989 to finance the acquisition, and Ames's bankruptcy trustee has sued its investment banker and Chief Executive Officer. All of the Ames securities cases have been heard in the District Court for the District of Connecticut, Peter C. Dorsey, *Judge.* Judge Dorsey dismissed the common stockholders' case under Federal Rule of Civil Procedure 12(b)(6), reasoning that the stockholders had failed to allege a "connection" between the fraud and their stock purchases. We reverse.

## BACKGROUND

The stockholders raise claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.-10b-5 (1992), and under the common law. They allege that seven directors and offi-

cers of Ames and Ames investment banker Wertheim Schroder & Co., Inc. ("Wertheim") disseminated 32 documents or statements into the market for Ames securities which contained false and misleading statements concerning Ames's financial health, its future profitability, and the success of Ames's integration of the newly-acquired Zayre stores. The complaint alleges that the defendants learned at specific meetings that Ames's financial situation was deteriorating rapidly, that internal financial and inventory reports were inaccurate and unreliable, and that the integration was failing and draining Ames's profitability. It further alleges that despite this information, the defendants disseminated, in addition to the prospectuses for the two debt offerings issued to finance the acquisition, false reports, news releases, and other statements painting quite a rosy picture of Ames's profitability and future.

As defendants, the stockholders named Ames's CEO and President Peter B. Hollis; its Board Chairman, James A. Harmon, who also served as chairman and CEO of defendant Wertheim; and directors and/or officers Duane R. Wolter, Ames Executive Vice President and Chief Financial Officer; Earl M. Spector, Executive Vice President, Secretary and member of the Board of Directors; Norman B. Asher, Ames director, member of Ames's audit and executive committees and outside counsel for Ames in connection with the acquisition and the first of the debt offerings; Maurice Segall, an Ames director since the acquisition, member of the Ames audit committee and former CEO of Zayre; Arthur F. Loewy, an Ames director after the acquisition, member of the Ames audit committee and a former Zayre financial officer; and Wertheim, which allegedly acted as investment banker to both Ames and Zayre in their merger negotiations, and as managing underwriter for the two debt offerings issued in connection with the acquisition. Both Hollis and Harmon also allegedly served on Ames' audit and executive committees.

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the false and misleading statements were not made "in connection with" a public offering of Ames's common stock so as to satisfy § 10(b) and Rule 10b–5, but, rather, rested solely upon allegations pertaining to the reset note and debenture prospectuses. The stockholders argue that the district court's conclusion that there was a failure to satisfy the "in connection with" requirement was erroneous as a matter of law, citing *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783 (2d Cir.1951) (reversing dismissal of common stockholders' § 10(b) complaint based upon misstatements in prospectus offering preferred stock). The stockholders also note that there were at least 25 documents unrelated to Ames's debt offerings which they alleged were misleading, including financial reports filed with the SEC and press releases issued to the general public. Each of these documents, they allege, independently violated Rule 10b–5; and all of them were part of the ongoing scheme to defraud them. None of these other documents was directed to holders or potential purchasers of a specific security; instead, all were directed to the general investing public.

We begin our discussion with a review of the facts as alleged in the stockholders' complaint. For purposes of our review of the 12(b)(6) dismissal, of course, we must take all of the allegations of the complaint as true.

## A. BACKGROUND TO THE ACQUISITION

Ames, a successor to a business founded in 1958, was incorporated in Delaware in 1962. A successful discount department store chain, it steadily expanded through the 1960s, '70s and early '80s. By 1970, it had 23 stores and annual sales of about $50 million. By 1985, its annual sales were approximately $300 million. In August, 1985, Ames effectively doubled its size by acquiring the G.C. Murphy chain of 108 discount department stores and 144 variety stores with annual sales of $900 million. By the end of Ames's fiscal year ending January 30, 1988, Ames's annual sales had

grown to more than $2 billion, and it had 342 discount department stores, 146 variety stores, and four distribution centers.

The Murphy Acquisition itself presented Ames with difficulties, leaving the company less profitable than it had been before and plunging the combined operations' controls into a state of chaos. In early 1988, Ames tried to resolve some of its control problems by hiring Arthur Andersen & Co. to rewrite the company's "computer codes and applications software," including programs matching receipts with purchase orders, organizing the distribution and replenishment system, and affecting the company's general ledger accounts and the preparation of essential financial information. In the second half of 1988, the internal audit department acknowledged that internal financial controls were inadequate, and financial statements for fiscal year 1989 and the quarterly statements for fiscal year 1990 did not conform to basic accounting principles.

Nonetheless, in October, 1988, Ames acquired the Zayre discount stores. By doing so, Ames announced to potential shareholders, the company had, for the second time in just over three years, doubled the number of its retail outlets. The Zayre acquisition was favored and negotiated by Ames's CEO and President Peter B. Hollis and by its Board Chairman, defendant James A. Harmon, who also served as chairman and CEO of defendant Wertheim.

From the beginning, the Zayre management allegedly was aware of potentially severe problems with the Zayre chain. Two members of the Ames board, including one of the company's founders, argued against the acquisition on the bases that Zayre was losing $125 million a year, that Ames would be strapped with payments to service an $800 million debt and would need operating earnings of approximately $225 million just to break even, and that the Zayre stores were mostly located in highly competitive urban areas where Ames itself had never been profitable. There allegedly was further opposition because Ames's chairman Harmon had a conflict of interest: he was also CEO and chairman of defendant Wertheim, and Wertheim was representing both Ames and Zayre in the transaction, thus precluding negotiation of the most advantageous terms for Ames. Following the vote to enter into the Zayre acquisition, the two opposing members of the board of directors resigned.

Following the acquisition, Ames learned that Zayre was using incompatible computer hardware, thus complicating the already troubled computer conversion. In its efforts to combine financial reporting of the two operations, Ames allegedly scrapped both original systems, rewriting basic software "affecting every aspect of the Company's operations and the accuracy of and access to financial information," and corporate controls of replenishment, distribution, receipts, and flow of goods. Throughout the class period, it is alleged that these problems resulted in gridlock at Ames warehouses, failure to pay vendors, mismanagement of inventory, and financial mismanagement and misreporting. Two months after the Zayre acquisition, Coopers & Lybrand, hired to perform an audit of the acquired assets, told Ames that it was "unable to satisfy [itself] as to inventory quantities and related values or related accounts payable accounts" with respect to the acquired Zayre stores. The computer snafus resulted in an inability to convert certain of Zayre's warehouses to Ames's warehouses, causing a warehouse gridlock which led to overstocking and vendor processing delays and forced the company to stock its stores by using drop shipments at individual stores.

In addition, the plaintiffs allege that the defendants had no realistic plan for restoring the troubled Zayre stores to profitability. The plaintiffs say that the defendants simply assumed that converting the Zayre stores to the Ames selling philosophy of everyday low prices would suffice. Management allegedly was warned by the dissenting directors that it did not understand the Zayre customer, that the Zayre stores were in such severe decline that it was overestimating the value of the stores' inventory, leases, and customer goodwill, and that Ames's merchandising philosophy in

the past had met with little success in urban locations. It is alleged that, because of this fundamental misunderstanding, the Zayre stores in areas where Ames had had no stores did not attract business under the Ames name, and that the cancellation of Zayre credit cards and 24–hour shopping resulted in customer complaints and the loss of goodwill and customers. Beyond this, it is said that the Zayre stores were themselves losing money, their customer base was eroding, and their inventories were overstated, and, in effect, that disaster beckoned on the near horizon for the combined enterprise.

Meanwhile, internal control weaknesses at Ames prompted Coopers & Lybrand, Ames's accountants, to inform the audit committee that "reportable conditions" existed at almost every level of Ames's internal controls. Details of the report are included in the complaint.

## B. THE CRITICAL DOCUMENTS AND STATEMENTS

Nonetheless, it is alleged, the defendants repeatedly offered glowing reports of the success of the acquisition to the public, beginning with a speech made by Hollis on September 15, 1988, to analysts, announcing the acquisition. In the speech, Hollis asserted that inventory problems at Zayre had been dealt with prior to the acquisition, and that Zayre would be a major contributor to Ames's profits. During the class period, these public pronouncements continued, and form a principal basis of the plaintiffs' allegations of 10b–5 violations.

The first of the critical documents to which the common stockholders look to support their securities claims is the 1989 Annual Report issued on May 10, 1989, the beginning of the stockholders' class period. Among other things, the report allegedly stated that "[t]he integration of the Zayre stores with Ames is proceeding faster than we anticipated.... During this year, we are confident that we can return the Zayre stores to ongoing profitability and blend our two chains into one well-managed company." The report touted the year as a "landmark," with anticipated sales increasing from $2 billion to $5 billion.

The Form 10–K for the fiscal year ending January 28, 1989 was filed with the SEC on May 10, 1989, the same day the Annual Report was released. All of the individual defendants are alleged to have signed the Form 10–K, which stated that "[t]he Company believes that the acquisition of the Zayre Discount Division will enable it to compete more effectively with other major retailers, and will provide it with a number of benefits...." The 10–K further suggested that "[t]he availability of the Company's Revolving Credit Facility ... will enable the Company to fund its need for working capital and capital expenditures for the foreseeable future."

On May 16, 1989, Ames explicitly incorporated the 1989 10–K and 1989 Annual Report in the $200 million Reset Note Prospectus, including statements such as "management believes that the acquisition ... presented a unique opportunity to acquire a major discount chain operating in complementary geographic areas...." In addition, the prospectus suggested that the integration of the Zayre stores was proceeding smoothly, that underperforming stores were being closed without incident, and that sales at the Zayre stores were meeting expectations. It is alleged that at the time these statements were issued, sales at the Zayre stores were significantly below planned projections, and that there was a decline in Ames's working capital and an increase in inventory and other audit and control problems.

On May 31, 1989, Ames announced that it had suffered a loss for the first quarter of fiscal year 1989 of approximately $12.3 million as opposed to a net gain of approximately $5.9 million for the corresponding quarter the year before, but nevertheless allegedly stated in a press release that "we continue to expect that annual earnings will exceed last year's." Indeed, the stockholders allege that on the following day, June 1, 1989, Ames made a further attempt to dilute the news of the first quarter loss: it announced an improvement in its sales for May, the first month of the second

quarter. In the press release, defendant Hollis was quoted as saying, "[w]ith the advent of better weather in late May, our sales returned to expected levels. We are looking forward to stronger sales for the remainder of this year."

On June 12, 1989, the company filed with the SEC its Form 10–Q for the first quarter ending April 29, 1989, again allegedly stating that "[t]he Company is on or ahead of schedule in integrating the Zayre stores.... [M]anagement continues to expect that annual earnings will exceed last year[']s."

At the Annual Shareholders' Meeting on June 19, 1989, according to a press release issued that day, defendant Hollis told shareholders that the Company anticipated that annual earnings would exceed the previous year's, with the bulk of the earnings improvement coming in the third and fourth quarters, as the consolidation of the Ames and Zayre chains gained momentum; and that "our consolidation of the Zayre stores is ahead of schedule."

These statements were issued despite the fact that internal projections allegedly showed a second-quarter loss of $5.3 million, creating a total year-to-date loss of $17.6 million, and allegedly providing no basis for projecting that sales for fiscal 1990 would improve to create any profit at all. The stockholders also allege that the defendants made these statements despite knowing that Ames's financial difficulties were exacerbated by the computer conversion project, resulting in an inability to guide shipments from warehouses to stores, to pay vendors properly, to determine net revenues, or otherwise to perform reliable profit and loss analyses. In addition, the company was forced to buy new cash registers for the entire Zayre chain, because of incompatibility with the computer system. This move was touted as a technological advancement in a press release dated July 24, 1989.

As of September, 1989, an internal forecast presented to the board allegedly projected a $17.2 million loss for fiscal 1990. Nevertheless, on September 13, 1989, the company released its Form 10–Q for the second quarter ending July 29, 1989, complete with continued representations that the integration of the Zayre stores was faring well. The Form 10–Q, signed by defendants Hollis and Wolter, again stated that "[t]he Company is on or ahead of schedule in integrating the Zayre stores" and that "[m]anagement expects that the changes now underway will allow the Company to take full advantage of economies of scale for the holiday selling season." The computer conversion was noticeably affecting financial reporting by September 7, 1989, when Coopers & Lybrand complained to the audit committee that it was not receiving quarterly results. At the same meeting, the defendants allegedly received information severely critiquing Zayre's internal control procedures.

On October 5, 1989, Ames filed a $155.25 million convertible debenture offering [1] and in connection with it an Amended Registration Statement, a Final Prospectus and an accompanying press release. The prospectus indicated that Ames had developed a detailed strategy for the integration of the Zayre Discount Division and was "on or ahead of schedule in implementing this strategy"; that "the Company has improved the in-stock position of basic merchandise"; and that "[t]he Company has significantly reduced overhead cost of the combined Zayre and Ames operations through the consolidation of home office, field management and distribution operations." As evidence of this so-called integration strategy, the prospectus stated that 74 under-performing Zayre stores had been closed and 53 of the related store leases were being disposed of, that a Zayre distribution warehouse and all the Zayre tire and lubrication locations had been

---

1. As we have noted, the convertible debenture-holders have a separate class action pending before the district court.

While the debenture prospectus lists only $135 million of debentures, a press release issued the same day indicated that Ames had granted the underwriters a 30–day option to purchase up to 20.25 million more in debentures. The underwriters exercised this option, and $155.25 million worth of debentures were sold.

closed; that conversion of 254 rural and suburban Zayre stores to Ames stores with an accompanying major advertising and promotional campaign would take place by November 1, 1989; and that state-of-the art cash registers, a satellite communications system and other efficiency improvements were being introduced.

The Final Prospectus further emphasized Ames's introduction to Zayre stores of its marketing and merchandising strategy of "everyday low prices on selected items," together with periodic promotions, the upgrading of Zayre's operating procedures to conform with Ames's systems, and the reorganization of the combined distribution and management information systems. The Final Prospectus also included allegedly misleading financial data, and reassured investors that anticipated strong sales in the forthcoming holiday selling season would enable Ames to meet its selling goals, and said that the company's revolving credit facility would satisfy its working capital and capital expenditure requirements for the foreseeable future. The stockholders allege that these statements were false and that the defendants knew or should have known that the company was facing its third consecutive quarterly loss in the supposed turnaround quarter. In addition, the stockholders note, the prospectus incorporated the 1989 Form 10–K, signed by all of the individual defendants, and the 1989 Forms 10–Q, signed by defendants Hollis and Wolter, which allegedly included similarly misleading statements.

On or about October 26, 1989, Ames issued a press release in which Defendant Hollis stated that "[t]oday marks an exciting benchmark in Ames' growth," and commented upon Ames's implementation of its merchandising and pricing policies, including the installation of advanced cash registers and related back-office systems at the Zayre stores and the introduction of a satellite communications network for tracking inventory price changes, credit card approvals, and the like. The October 26 press release was followed up on November 7, 1989, by a press release stating that Ames had experienced a 103.3 percent increase in sales for the four weeks ending October 28, 1989.

On November 30, Ames issued two additional press releases reporting that sales for November 1989 were down 2.8%, but representing that total sales for the 43 weeks ending November 25 were up 86.5% and attributing the slow November sales to economic factors beyond the company's control. The releases reported an extraordinary charge of $5,057,000, or 13 cents per share, from the extinguishment of debt incurred in connection with the Zayre acquisition. Nevertheless, the press release emphasized Ames's success at converting Zayre stores to Ames stores, stating that

[f]rom a strategic standpoint, we achieved what we set out to accomplish ... with our newly-converted and well-stocked stores, we have met our goal of being ready for the holiday season. Although sales in the former Zayre stores during November have been below our expectations and below last year, at this point we still expect an increase in earnings for the fourth quarter and expect the full year to be profitable.

On or about December 8, 1989, Ames sent a special report to its shareholders, commenting favorably on third-quarter results and on the "well-executed" October conversion of 254 Zayre stores to Ames stores, and stating that Ames expected to post a profit for the fiscal year.

On December 12, 1989, Ames filed its Form 10–Q for the third quarter ending October 28, 1989, which allegedly significantly understated third quarter losses despite the availability of information that the data was incorrect. On December 14, Ames declared its regular quarterly dividend. On or about January 4, 1990, Ames issued a press release reporting a modest decrease in sales for December, 1989, but otherwise portraying a picture of financial health for fiscal 1990 and indicating that the company was pleased with sales at the original Ames stores. What this release did not disclose was that December sales had fallen short of Ames's expectations by $94 million, and that this, together with a decline in profit margin rates, had pro-

duced a margin shortfall of approximately $40 million.

On or about January 10, 1990, Ames issued a press release which, among other things, stated that Ames expected to report a profit for its fourth quarter but that it did not expect earnings to be sufficient to produce a profit for the year. We quote from it as follows:

> We were pleased with the holiday season performance of the original 375 Ames stores, which had a comparable-store sales gain of 5.8 percent. But because of soft sales at the 315 Zayre stores acquired in 1988, we no longer expect fourth-quarter earnings to be sufficient to show a profit for the year.
>
> Our results were hampered by a soft economy, particularly in the Northeast, and an intensely competitive holiday selling season. Our profit shortfall is due entirely to a sales shortfall at the acquired stores, despite a significant reduction in the Zayre historic expense level. The Ames stores continue to perform well.

In addition, the release stated that "[w]e are convinced that these [Zayre] stores can and will become profitable, even at sales levels that will be initially lower than we thought."

In response to this press release, on January 11, 1990, the first of the common stockholders filed suit.

On or about February 1, 1990, Ames issued a press release stating that its sales for the month of January were $230 million and that its sales for the fiscal year ending January 27, 1990 had increased some 50.5 percent over the comparable period in 1989, but did not mention the possibility that Ames would suffer an unprecedentedly large loss in fiscal 1990.

By April, problems in paying creditors in March resulted in vendors' refusal to ship goods. On April 9, 1990, Ames announced that it expected to report a net loss for the fiscal year ending January 27, 1990 of $228 million. According to the release, approximately $150 million of the loss was for the establishment of an after-tax restructuring reserve to cover the cost of closing the 74 unprofitable Zayre stores. Ames further stated that it was negotiating with its banks for a new credit agreement, and that it had retained investment bankers to assist the company in connection with a restructuring.

Disaster had struck. The price of the common stock, which had already dropped several points after the January announcement of a small loss, plunged. On April 25, Ames filed for bankruptcy.

## DISCUSSION

As we have noted, the district court dismissed the stockholders' complaint after concluding that it did not meet the "in connection with" requirement set forth in § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (1988), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1992), thereunder. The Rule bars the use of deceptive devices or fraud "in connection with" the purchase or sale of a security. Considering only those allegations relating to misstatements in the reset note and debenture prospectuses, the district court dismissed the stockholders' complaint for failure to allege that the false and misleading statements were made "in connection with" their stock purchases, all of which were made on the open market in the period between May 10, 1989 and April 10, 1990, the day after Ames announced its $228 million loss for fiscal year 1990. It appears that the district court construed the "in connection with" requirement as requiring that the statements be made in the registration statements for the particular stock at issue—in short, as if it were identical with the requirement for claims involving §§ 11 and 12 of the 1933 Act. The 1933 Act, in imposing strict liability on issuers for the accuracy of statements in issuing documents, sharply limits the class of potential plaintiffs to those who bought shares of stock thus issued. In contrast, claims under § 10(b) of the 1934 Act, which is aimed broadly at fraudulent activity in connection with the purchase or sale of securities, may be brought by any purchaser or seller of stock who lost money as a result of the intentional or reckless dissemination into

the marketplace of false or misleading information.

■ In analyzing the "in connection with" requirement, the district court erred in two respects. It erred as a matter of law in that we have, at least since *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783 (2d Cir.1951), and extending through *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), to *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), considered the phrase "in connection with" more broadly in an action under § 10(b) of the Exchange Act of 1934 than we have treated it under §§ 11 and 12 of the Securities Act of 1933. We have done so quite properly in light of the Supreme Court's instructions, in *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), that "[s]ection 10(b) must be read flexibly, not technically and restrictively." In the wake of the *Superintendent of Ins.* case, there remains quite a bit of confusion in evaluating marginal cases;[2] however, there should no longer be any doubt that a case such as this one alleges the type of fraud at which § 10(b) was aimed. As Judge Friendly put it,

> [t]he purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting

with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The fraud alleged in this action is a classic of the genre: according to plaintiffs, the defendants deliberately or recklessly deceived them by saturating the market with misleading information in an effort to prop up the price of Ames's stock.

We will elaborate on the concept of "connection" under Rule 10b–5, and where it leads us in this case, below.

The district court also made an error of fact: it assumed that the stockholders' § 10(b) claims were based solely upon misrepresentations in and omissions from the reset note and debenture prospectuses, and thus failed to consider or to distinguish the potential liability of the defendants for alleged misstatements and omissions in press releases, news articles, and quarterly and annual public filings "in connection with" which the stockholders made their purchases. The complaint contains numerous allegations of false and misleading statements contained in the non-prospectus documents, some of which support the stockholders' claims independently (if their other allegations are deemed to be true). We will also elaborate on this error, and its implications for the case, below.

---

**2.** We note that Pace University Law School Professor Barbara Black, in *Securities Commentary: The Second Circuit's Approach to the "In Connection with" Requirement of Rule 10b–5*, 53 Brook.L.Rev. 539, 540 (1987) states that "[s]ince 1984, the 'in connection with' requirement has been described both as 'broad' and as 'stringent.'" (footnote omitted) (quoting *United States v. Carpenter*, 791 F.2d 1024, 1033 (2d Cir.1986) and *Crummere v. Smith Barney*, 624 F.Supp. 751, 754 (S.D.N.Y.1985)).

Judge Friendly discussed the point in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), noting that the broad statements are typically made in cases like *United States v. Newman*, 664 F.2d 12, 18, *judgment following remand aff'd by order*, 722

F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), "where the connection was anything but tenuous," *Chemical Bank*, 726 F.2d at 942, and went on to say that "[i]n cases near the borderline, courts have warned that '[i]t is important that the standard be fleshed out by a cautious case-by-case approach,'" [citing cases], and that "[w]e ourselves have stated that *Superintendent of Insurance* 'pushed the perimeters rather far', *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1014 n. 26 (2d Cir.1975)." *Id.* at 942–43. *See also* C. Edward Fletcher, *The "In Connection With" Requirement of Rule 10b–5*, 16 Pepp.L.Rev. 913 (1989) (arguing that the analysis of the "in connection with" requirement should vary with the factual characteristics of the claim).

## A. THE LEGAL ERROR

We commence with the proposition that a ruling dismissing an action for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6) is subject to *de novo* review. *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). On *de novo* review, such a dismissal may be upheld only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief". *Austern v. Chicago Bd. Options Exch., Inc.*, 898 F.2d 882, 885 (2d Cir.), *cert. denied*, 498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990), *quoting Phillips Business Sys., Inc. v. Exec. Communication Sys., Inc.*, 744 F.2d 287, 290 (2d Cir.1984) (in turn quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

As we have noted, the district court evidently assumed that the only statements that are made in connection with the sale of stock are those made in the issuing documents. This reasoning would eliminate the vast majority of private Rule 10b–5 actions and subvert the 1934 Act's efforts to protect investors from deliberate fraud. The securities markets are highly sensitive to press releases and to information contained in all sorts of publicly released corporate documents, and the investor is foolish who would ignore such releases. In light of this, defendants have been held liable for misrepresentations in press releases, *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and for misrepresentations in corporate documents other than those issued to shareholders, *Fischman v. Raytheon*, 188 F.2d 783.

The principle is at least as old as *Fischman v. Raytheon*, which established that a 10b–5 action may be brought when one, in reliance upon false and misleading statements in a registration statement, purchased securities which were not the subject of that registration statement. The *Fischman* case involved a prospectus and registration statement concerning an issue of preferred stock. The trial court had held that common stockholders had no claim under § 11 of the Securities Act for misstatements in the prospectus and registration statement since they had purchased no securities which were the subject of the prospectus and registration statement. It went on to hold that suit under § 10(b) of the Exchange Act would not be permitted since Congress could not reasonably have intended that stockholders under the Exchange Act could maintain a suit for the very conduct not actionable under § 11 of the Securities Act. This court, per Judge Frank, a former Chairman of the SEC, heartily disagreed and reversed, holding that

A suit under § 11 of the 1933 Act requires no proof of fraud or deceit, and such a suit may be maintained only by one who comes within a narrow class of persons, *i.e.*, those who purchase securities that are the direct subject of the prospectus and registration statement.... But proof of fraud is required in suits under [Section 10(b) and Rule 10b–5].... Congress reasonably, and without inconsistency, allowed suits of that sort which (1) are free of the restrictions applicable to a suit under § 11 of the 1933 Act and (2) which are not confined to those persons who may properly sue under that section but which include all who are the victims of the fraud. We think that when, to conduct actionable under § 11 of the 1933 Act, there is added the ingredient of fraud, then that conduct becomes actionable under § 10(b) of the 1934 Act and the Rule, at the suit of any defrauded person, whether or not he could maintain his suit under § 11 of the 1933 Act.

188 F.2d at 786–87.

The opinion went on to posit a case showing that if the rule were otherwise it would afford "a shelter or sanctuary for those who defraud investors": the posited case was that of a corporation and its insiders putting out a false prospectus and registration statement for a very small issue of preferred stock with the aim not only of fraudulently inducing some investors to purchase the preferred stock but also of fraudulently inducing others to purchase a

much larger amount of the company's common stock. *Id.* at 787. The court went on to permit the common stockholders to amend their complaint by alleging facts showing that the defendants attempted to induce the purchase of common stock by making fraudulent statements in the offering statements associated with the preferred stock, and that in this fraudulent purpose the defendants had succeeded in defrauding the common stockholders.[3] Thus, the *Fischman* case stands for the proposition that it is not a bar to a 10b–5 action that the false and misleading statements in a Registration Statement are pertaining to an issue of a security, be it preferred stock, reset note, or debenture, or otherwise, which is not the security purchased.

This of course is not to say that the plaintiffs have thereby established that their purchases were made "in connection with" fraudulent statements.[4]

Since *Fischman,* the meaning of the "in connection with" requirement has undergone considerable evolution, which perhaps contributed to the district court's confusion. In our early cases, such as *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); *Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co.,* 430 F.2d 355, 361 (2d Cir.1970), *rev'd,* 404 U.S. 6, 92 S.Ct.

165, 30 L.Ed.2d 128 (1971); and *Drachman v. Harvey,* 453 F.2d 722, 730–32 (2d Cir. 1971), *rev'd on rehearing* 453 F.2d 736 (2d Cir.1972) (en banc), we took a rather narrow view of "connection." The narrow view was rejected, however, by the United States Supreme Court in reversing the *Superintendent of Ins.* case. 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In its opinion, the Supreme Court held that § 10(b) must be read "flexibly, not technically and restrictively," 404 U.S. at 12, 92 S.Ct. at 169, so as to ensure that "novel" and "atypical," as well as "garden type variety," frauds would not escape liability under the Rule, *id.* at 11 n. 7, 92 S.Ct. at 168 n. 7 (quoting *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir.1967)). The case also added a new term of art to the jurisprudence of Rule 10b–5, by stating the question it posed as follows: whether a security buyer or seller suffers an injury as a result of deceptive practices "touching" its purchase or sale of securities. 404 U.S. at 12–13, 92 S.Ct. at 168–69.[5]

Professor Bromberg, analyzing the implications of the *Superintendent of Ins.* case, notes that it is risky to devise a test of "connection," both because the Court refused to do so and because the situations to which the requirement must apply are so various. Nonetheless, he points out that "connection" must have "some boundaries, and an effort should be made to verbalize

**3.** It has since been generally established that reckless, as well as deliberate, misleading statements may give rise to a 10b–5 claim. *E.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.) (though reserving question of whether recklessness suffices for aiders and abettors), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80, and *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *IIT, an Int'l Investment Trust v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980).

**4.** For example, the issue of liability for "soft information," such as projections, will be involved. While the information here is not as "soft" as that in, *e.g., Zerman v. Ball,* 735 F.2d 15 (2d Cir.1984) ("When E.F. Hutton Talks, People Listen" and puffery that a bond was "marvelous"), exactly what constitutes recklessness in forming an opinion may be somewhat different from what constitutes recklessness in making an independently verifiable factual statement. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 776

(3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985), *citing Chris-Craft Indus. v. Piper Aircraft Corp.,* 480 F.2d 341, 363–64 (2d Cir.) (prediction issued without a genuine belief or reasonable basis violates prohibition on fraud), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 and *cert. denied,* 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973). *See also Goldman v. Belden,* 754 F.2d 1059, 1068–69 (2d Cir.1985) (identifying factual components of overly optimistic forecasts).

**5.** The 9th Circuit has stated that "[t]he touch test ... is nothing more than a restatement of the 'in connection with' test." *In re Financial Corp. of America Shareholder Litig.,* 796 F.2d 1126, 1130 (9th Cir.1986), *citing* Louis Loss, *Fundamentals of Securities Regulation* 903–04 (1983). Indeed, the term seems chosen more to highlight the breadth the case advocated in interpreting the requirement than to provide a new test for the applicability of the Rule.

them." Alan R. Bromberg and Lewis D. Lowenfels, 2 *Securities Fraud & Commodities Fraud* § 4.7(574)(3) at 88.34 (1973) [hereinafter "Bromberg"].

In applying the "connection" requirement to open market purchases such as those involved in this case, we come first to a case preceding *Superintendent of Ins.* but of great significance, the 1968 *SEC v. Texas Gulf Sulphur* decision, 401 F.2d 833, 860 (2d Cir.1968) (en banc, 7–2), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). As Bromberg points out, this court construed "connection" broadly in terms of protecting the public investor from inaccurate information. 3 Bromberg § 7.6(2)(a) at 190.23 (1969). The court held that Congress, in using the phrase "in connection with", "intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." 401 F.2d at 860. The court went on to say that

> [t]here is no indication that Congress intended that the corporations or persons responsible for the issuance of a misleading statement would not violate the section unless they engaged in related securities transactions or otherwise acted with wrongful motives; indeed, the obvious purposes of the Act to protect the investing public and to secure fair dealing in the securities markets would be seriously undermined by applying such a gloss onto the legislative language.

*Id.*

Bromberg notes that

> Since the court's quoted test of "connection" closely resembles the same decision's criterion for materiality, the lesson seems to be that any material information issued by a corporation (whose securities are publicly traded) has appropriate "connection" to constitute a 10b–5 violation if the information is misleading. The result is to set an exacting standard

of "due diligence" for the preparation of releases by corporations with actively traded securities.

Bromberg § 76(2)(a) at 190.24 (footnotes omitted).[6]

It is precisely the failure to meet that standard that is alleged here by the common stockholders during the period following the Zayre acquisition up to the announcement of the staggering loss for fiscal year 1990.

The defendants seek to distinguish *Texas Gulf Sulphur* as a case in which "broad investor impact was not only reasonably foreseeable, but also envisioned by the company," thereby establishing the required linkage. In contrast, they argue, the prospectuses here were directed to "discrete groups of potential purchasers, not issued to the public generally," and suggest that there was no reason to indicate that reasonable investors in other Ames securities would rely upon these prospectuses and filings. We disagree. Not only do the defendants' arguments ignore the well-established rule that reckless, as well as intentional, manipulation of the stock market may violate Rule 10b–5, *see* note 2, *supra,* but they also fail to acknowledge that these are precisely the sort of documents which a reasonable investor would consider in evaluating a company's prospects. Ames's statements made in conjunction with its May issuance of $200 million of reset notes and its October issuance of $155.25 million of debentures convertible into common stock were of a sort quite likely to influence the investing public's interest in the company's common stock as well.

Other Second Circuit cases since *Texas Gulf Sulphur* support the broad construction of the "in connection with" requirement established in that decision. For example, *Ross v. A.H. Robins Co., Inc.,* 607 F.2d 545 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), holds that conduct may be proscribed by § 10(b) even though it is also

---

**6.** This analysis should be read in light of the Supreme Court's subsequent determination, in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that scienter is an element of Rule 10b–5 violations.

subject to § 18 of the Exchange Act, which imposes liability for statements made in reports to the SEC. This decision recognizes that statements directed to the general public which affect the public's interest in the corporation's stock are made in connection with sales or purchases of that stock. As the *Ross* case stated, "[to hold otherwise] would be remarkably incongruous in view of the fact that it is the open market investor who over the years has become one of the prime beneficiaries of the protection afforded by § 10(b) and Rule 10b–5." 607 F.2d at 556. The *Ross* court noted that § 10(b) and Rule 10b–5 "have become, by careful judicial construction, the primary mechanisms by which open market investors can seek redress against those who manipulate the market by fraudulent activity." *Id.* Again, this statement recognizes that statements which manipulate the market are connected to resultant stock trading. In this case, the common stockholders allege that open market investors were induced to buy stock by misleading statements that the acquisition of Zayre and its integration into Ames was succeeding, and that Ames would show a profit by the end of the year. In fact, they allege, the individuals responsible for the statements in the public filings and the company which underwrote the issuances were aware that the rosy picture was a false and misleading one. This is precisely the sort of connection described in *Texas Gulf Sulphur* and in *Ross. See also Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (§ 10 and § 11 claims may be brought based on same set of facts).

It may be that the district court went astray because of the confusing nature of some of the cases classifying atypical frauds as connected or not connected to securities transactions. Ever since the Supreme Court made clear in the *Superintendent of Ins.* case that atypical frauds, too, come within the purview of the Act, courts have struggled to determine the boundaries of the requirement. *Superintendent of Ins.,* like many of the troublesome "in connection with" cases which have arisen since, dealt with an essentially face-to-face transaction, in which the defendants tricked the plaintiffs into parting with their securities for no consideration at all. Such frauds pose analytical difficulties not present in a straightforward case such as the one alleged here, in which the defendants are accused of defrauding the plaintiffs by misleading the general public as to the market value of securities they had issued. However we deal with the more difficult cases—and we note that Judge Friendly, in *Chemical Bank,* and Justice Marshall, in *S.E.C. v. Nat'l Sec. Inc.,* 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969) (Rule 10b–5, generally) have urged caution here—we should not let them affect our understanding that ordinary securities frauds, frauds which affect the "integrity of the securities markets," as this court described them in *Superintendent of Ins.,* 430 F.2d at 361, fall well within the Rule.

The cases on which the district court relied in reaching its conclusion that there was no connection between the statements and the purchases made here are illustrative. For example, while both *Pross v. Katz,* 784 F.2d 455 (2d Cir.1986), and *Crummere v. Smith Barney, Harris Upham & Co., Inc.,* 624 F.Supp. 751 (S.D.N.Y. 1985), involve sales of stocks, in their general outlines they much more closely resemble cases of ordinary fraudulent conversion than of securities fraud. In *Crummere,* the plaintiff's broker convinced her to sell her stock, then fraudulently converted the proceeds. In *Pross,* while the key allegations of fraud were, essentially, that Katz stole Pross's securities, there were also prior purchases, which Pross alleged were fraudulently induced by the defendant's representations of general honesty. The key to both of these cases is that the fraud followed the securities transactions. Another case on which the district court relied, *Bennett v. United States Trust Co. of N.Y.,* 770 F.2d 308 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), turns on the loss causation and transaction causation concepts which we have often found useful in analyzing unusual fact patterns, *see Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374,

380–81 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *Bennett* may be helpful in · determining when a misrepresentation that does not involve the value of a stock nonetheless may be deemed "connected" with a securities transaction. It is not, however, very helpful in examining the facts of this case. In short, the district court relied on difficult cases involving atypical frauds, which throw little light on the "in connection with" requirement in straightforward cases such as this. Without commenting on how to analyze the more difficult cases, we can say this much here: when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value, made by a defendant whose position made it reasonable for the plaintiff to rely on the representation and imposed some duty on the defendant to be honest or to disclose information, then whatever problems there may be with the case, a connection between the fraud and the transaction should not be one of them.[7]

As we held in *Heit v. Weitzen,* 402 F.2d 909, 913 (2d Cir.1968), *cert. denied,* 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), even before the Supreme Court's expansive interpretation of the "in connection with" requirement was made clear, "[i]t is reasonable to assume that investors may very well rely on the material contained in false corporate financial statements which have been disseminated in the market place, and in so relying may subsequently purchase securities of the corporation."

The district court's error, and the appellees' untenable position on this appeal, are highlighted by a consideration of *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), in which the Supreme Court held that reliance could be presumed where the fraud-on-the-market concept applied. In *Basic Inc.,* the defendants, in response to stock market movements, said there were no ongoing merger discussions or known corporate developments, and the plaintiffs, common stock holders, sold their stock after these denials; in fact, the company had been approached as to a merger, and indeed the merger took place after the plaintiffs' sales. The statements neither had any specific audience nor were related to any specific security, but were held, on the basis of a fact-specific inquiry, to be material and to permit the application of a rebuttable presumption of reliance, supported in part by the fraud-on-the-market theory. *Id.* at 241–45, 108 S.Ct. at 988–90. The Court said that

> [a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

*Id.* at 247, 108 S.Ct. at 992.

While *Basic Inc.* addressed the reliance and materiality requirements, rather than the connection requirement, the fraud on the market theory is premised on the notion that fraud can be committed by any means of disseminating false information into the market on which a reasonable investor would rely. Because the fraud on the market may taint each purchase of the affected stock, each purchaser who is thereby defrauded (and, since the presumption is rebuttable, not all purchasers necessarily are defrauded by the information) is defrauded by reason of the publicly disseminated statement. If such a straightforward cause and effect is not a connection, then the Rule would not punish a particularly effective means of reducing the integrity of, and public confidence in, the securities markets. The "in connection with" language was chosen in an effort to broaden the reach of the Rule to achieve precise-

---

7. *See* Black, *supra* note 2, and Fletcher, *supra* note 2, for discussions of the range of factual settings in which the "in connection with" requirement has posed problems. As Professor Fletcher has suggested, "[o]ne of the main causes of confusion when interpreting the 'in connection with' requirement is the explosive growth of 10b–5 to cover vastly different types of transactions. As a result, the requirement also comes under analysis in a wide variety of situations." Fletcher at 929.

ly these aims, *see, e.g., SEC v. Texas Gulf Sulphur*, 401 F.2d at 860–62; it should not be used to defeat them.

### B. THE DOCUMENTS OTHER THAN THE NOTE AND DEBENTURE PROSPECTUSES

■ We have already indicated that, in ruling against the common stockholders, the district court misread the facts as well as the law. The stockholders' complaint is not based solely upon misrepresentations in and omissions from the reset note and debenture prospectuses, but alleges a common course of false and misleading statements, including press releases, news articles, and quarterly and annual public filings, in connection with which the common stockholders made their purchases. In addition to the debt prospectuses, the defendants are alleged to have issued twenty-five such documents containing materially false and misleading statements, many of which go to the heart of the case, and a number of which are enumerated above. Through them, it is alleged that defendants created a false impression in the investing public, throughout 1989 and early 1990, that Ames was financially secure, that it would be profitable at year end, and that the integration of Zayre into Ames was proceeding successfully. Allegedly, these releases and documents contributed to the " 'total mix' of information made available" to the investing public and contributed to the artificial inflation or maintenance of the market price of Ames's common stock. *See generally Basic Inc. v. Levinson*, 485 U.S. at 232, 108 S.Ct. at 983, *quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (discussing the impact of publicly released information on prices of stocks trading in efficient markets and adopting the materiality standard of *TSC Indus.* for 10b–5 claims—that an omission is material if, in the view of a reasonable investor, it affects the total mix of information available). Thus, even if the district court were correct on the law, which, as we have indicated above, it was not, it also made erroneous factual assumptions which led it to dismiss the plaintiffs' claim improperly.

## CONCLUSION

Because we conclude that the stockholders have properly alleged a connection between the fraud and their stock purchases, we reverse the 12(b)(6) dismissal. Reinstatement of the federal claims carries with it the reinstatement of the pendent state law claims.